Glen M. McKEE and Greater Anchorage Area Borough, Appellants,

v.

Gerald M. EVANS et al., Appellees.

No. 1382.

Supreme Court of Alaska.

Nov. 22, 1971.

---

Richard A. Helm and Charles P. Flynn, of Burr, Pease & Kurtz, Anchorage, for appellants.

William J. Bailey, of Croft & Bailey, Anchorage, for appellees.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

ERWIN, Justice.

The sole question presented for review is whether the Apprenticeship and Manpower Training Trust Fund is entitled to an exemption from real property taxation by the Greater Anchorage Area Borough (GAAB) on the ground that its property is "used exclusively for nonprofit * * * educational purposes" within the meaning of AS 29.10.336(a).

On April 9, 1969, the Assembly of the GAAB, sitting as a Board of Equalization, ruled that the Trust Fund was not so entitled. Appellees, trustees of the Trust Fund, appealed this decision to the superior court where both parties filed cross motions for summary judgment.[1] On March 20, 1970, Judge Lewis granted appellees' motion for summary judgment, ruling that the Trust Fund property was entitled to exemption. This appeal followed.

THE PROPERTY

The property in question is located on East 22nd Avenue at Boniface Parkway in Anchorage, Alaska. It is improved by three buildings: a school building, a storage building, and a welding shop. The property is owned by the Apprentice and Manpower Training Trust Fund, a management trust[2] set up in 1957 by the collective bargaining agreement between the National Electrical Contractors Association (NECA) and Local Union No. 1547 of the International Brotherhood of Electrical Workers (IBEW). Management of the Trust Fund property is vested with the Joint Apprenticeship Training School Committee which is composed of ten members with equal representation from the IBEW and NECA. The Committee employs a director/instructor, an assistant and a secretary on a full-time basis.

The property is used in conjunction with an apprenticeship training program consisting of five and one-half months formal training at the school, three years of apprenticeship or on-the-job training, and a brief refresher course again at the school.[3] The formal training consists of lectures and demonstrations on the theory and practice of electrical work, and is somewhat similar to courses offered in state-supported high

---

1. No disputed questions of fact were presented, both parties relying on the deposition of George A. Seaman, Jr., a trustee of the Fund, for their statement of facts.

2. The Trust Fund is designated a "management" trust because funding is obtained entirely from employers at a rate set by the collective bargaining agreement.

3. The Declaration of Trust gives the following statement of purpose:

The employers [Alaska Chapter, NECA] desiring to improve the training opportunities and perpetuate the skills of the electrical contracting industry hereby establish the Apprentice and Manpower Training Trust Fund * *.

schools and colleges. A Journeyman Electrician's examination is then given. If he successfully passes the exam, the apprentice receives a certificate as a journeyman electrician from the United States Department of Labor.

The training reflects guidelines promulgated by the United States Department of Labor and the Bureau of Apprenticeship Training,[4] and is similar to programs in other states.[5] It is not the exclusive means of getting the certificate; nor are employers restricted in hiring apprentice electricians to program participants although a preference apparently exists.

Any person may apply for the training, and neither the NECA nor the IBEW can prevent acceptance of an individual. Entrance requirements include a high school education, successful completion of a mathematics examination, and a $10 fee which is refunded on completion of 75% of the training. Since a large part of the program consists of on-the-job training, the size of classes is keyed to the job market as predetermined by the trustees in advance of accepting applications. The number of students has ranged between 25 and 40 during the last several years. Students are recruited from all over the state to participate in the apprenticeship program; an attempt is made to take at least 10% Alaska Natives in each year's class.

Other than the $10 fee, there is no charge for any of the formal training. However, the student must purchase his own textbooks (about $50) and arrange for his own lodging. The Trust Fund is nonprofit; the amount it receives under the collective bargaining agreement is reviewed at each bargaining session to insure that it is needed for operation of the school.

The facilities are also used for training and refresher courses for journeymen electricians. In addition, they have been utilized by the Alaska Electrified Village Group and by the Bureau of Indian Affairs to train Alaska Natives. The facilities have not been used for any other purpose.

THE EXEMPTION

Article IX, Section 4, of the Alaska Constitution provides in relevant part as follows:

> All, or any portion of, property used exclusively for non-profit religious, charitable, cemetery, or educational purposes, as defined by law, shall be exempt from taxation.

AS 29.10.336(a) provides in similar part as follows:

> [A]ll property used exclusively for non-profit religious, charitable, cemetery, hospital, or educational purposes * * * [is] exempt from taxation.

The minutes of the constitutional convention reveal no indication of what was intended to constitute an "educational" purpose, the drafters stating merely that they intended to adopt a "standard" state exemption.[6] Nor has the legislature defined the term as it has done with regard to "religious purposes".[7]

"EDUCATIONAL PURPOSES"

This case basically presents a dispute over the meaning of the term "educational purposes" as used in our constitution and the exemption statute.[8]

In a case somewhat similar to the one at bar, the Supreme Court of Tennessee held that a building in which unions conducted classes, sometimes only for union

---

4. The school's program is reviewed periodically by the National Director of Apprenticeship, and training groups for IBEW and NECA.

5. The program involved here is apparently somewhat unique in that the formal training is concentrated rather than spread out over the entire four-year apprenticeship period; this concentration is due to problems of travel in Alaska.

6. 2 Alaska Constitutional Convention Proceedings at 1110.

7. AS 29.10.336(b).

8. Appellants' statement of points on appeal challenged the finding by the superior court that the Trust Fund is a non-profit institution. However, in their brief, appellants concede that status. Nor is any issue of non-exclusive use now raised.

members, was exempt from local property taxation under constitutional and statutory language similar to our own. Nashville Labor Temple v. City of Nashville, 146 Tenn. 429, 243 S.W. 78 (1922). Stressing the public benefit derived from the classes, the Tennessee court reasoned that:

> [T]o teach men in these arts or crafts is as essential and beneficial to the public as to teach one astronomy, civil engineering, medicine, pharmacy, or other useful professions. All of such arts or crafts, in which instructions are given by complainant corporation, are highly essential to the commercial and business interests of the country, and to the public welfare. Instructions which will make a better machinist, boiler maker, steam pipe fitter, plumber, or carpenter confers a benefit upon the public, and a consequent relief, to some extent, of the burden upon the state to care for and advance the interests of its citizens.

243 S.W. at 81.[9]

The type of school which has generated the greatest amount of litigation in this area is the business school or college. Most courts faced with an exception issue involving such schools have utilized similar public benefit analysis in determining whether an institution is entitled to exemption.[10] For example, the Washington Supreme Court in Wilson's Modern Business College v. King County, 4 Wash.2d 636, 104 P.2d 580, 584–585 (1940), explicitly rejected a generalized/specialized school distinction[11] and held that:

> The plain import of the exemption statute is that the terms "school or college" * * * should be given their ordinary meaning. The fundamental object of the statute is to exempt from taxation property used for school purposes and it would be a narrow construction to hold that business colleges like the respondent are not within the purview of the statute.[12]

In contrast, a number of courts have placed a judicial gloss on educational exemption provisions by requiring that the program of instruction given generally parallel that offered in publicly supported educational institutions.[13] The rationale for

9. The determination not to utilize a restrictive concept of education is also apparent in Pasadena Playhouse Ass'n v. Los Angeles County, 69 Cal.App.2d 611, 159 P.2d 679 (1945) (property of actors' school held exempt), and Township of Princeton v. Institute for Advanced Studies, 59 N.J.Super. 46, 157 A.2d 136 (App.Div.1960) (property of loose confederation of graduate students and faculty held exempt).

10. Phraseology of state exemption provisions varies greatly, some referring to "schools", "colleges", "academies", or "seminaries of learning", and others, as Alaska's, merely referring to property exclusively used for "educational purposes." The cases seldom make hypertechnical distinctions based upon the particular words used which seem to be more the result of historical vogue than limiting draftsmanship.

11. One of the earliest cases to consider an educational property tax exemption denied exemption to a stenographers' school on the basis that the constitutional provision involved contemplated schools of "general" learning and not schools dedicated to the education of a "particular class for a special object and for a specific calling." Lichentag v. Tax Collector, 46 La.Ann. 572, 15 So. 176, 177 (1894). Only a few other cases have since relied upon this generalized/specialized education test to deny exemption. The distinction is a throwback to a classical view of education which has little relevance today.

12. See also Simpson v. Jones Bus. College, 113 So.2d 760 (Fla.App.1959), aff'd, 118 So.2d 779 (Fla.1960); Indiana State Bd. of Tax Comm'rs v. Int'l Bus. College, 251 N.E.2d 39 (Ind.App.1969); Lawrence Bus. College v. Bussing, 117 Kan. 436, 231 P. 1039 (1925); National College of Bus. v. Pennington County, 82 S.D. 391, 146 N.W.2d 731 (1966). Cf. City of Birmingham v. Birmingham Bus. College, 256 Ala. 551, 56 So.2d 111 (1951).

13. Washington Chapter of Am. Institute of Banking v. District of Columbia, 92 U.S.App.D.C. 139, 203 F.2d 68 (1953) (banking school—exemption denied); Milward v. Paschen, 16 Ill.2d 302, 157 N.E. 2d 1 (1959) (mortician's school—exemption denied); Coyne Elec. School v. Pas-

this limitation is that only such school properties as relieve some substantial educational burden from the state should receive rights of tax exemption. Although this *quid pro quo* reasoning has superficial appeal in a period of financial crisis for local government, we find it unconvincing. In Alaska the power of deciding what types of education are to be publicly supported, either under the School Foundation Act[14] or by tax exemption,[15] is vested with the legislature. AS 29.10.336 in no way delimits the term "educational purposes", and we see no justification for this court to give to that term anything other than its ordinary meaning. That restrictive definition is a legislative concern seems especially apparent at a time when there is increasing desire for specialized practical education, a proliferation of new kinds of educational institutions, and rapidly changing concepts of mass education.[16]

We hold that the phrase "educational purposes" as used in Article IX, Section 4, of the Alaska Constitution and AS 29.10.336(a) includes systematic instruction in any and all branches of learning from which a substantial public benefit is derived.[17]

We are not unmindful of the widely accepted canon of construction which requires that provisions exempting property from ad valorem taxation be strictly construed against the property holder and in favor of the taxing authority.[18] Nor do we now intend to reflect unfavorably upon the policy behind that canon of construction.[19] We hold only that if that policy is to be implemented so as to exclude property which is clearly being used exclusively for nonprofit educational purposes, it must be done by the legislature.

chen, 12 Ill.2d 387, 146 N.E.2d 73 (1957) (electronics trade school—exemption denied); David Walcott Kendall Memorial School v. City of Grand Rapids, 11 Mich. App. 231, 160 N.W.2d 778 (1968) (school of design—exemption granted); State v. Northwestern Preparatory School, 249 Minn. 552, 83 N.W.2d 242 (1957) (school offering "cram course" for military academy applicants—exemption denied); Graphic Arts Educational Foundation v. State, 240 Minn. 143, 59 N.W.2d 841 (1953) (printing trade school—exemption denied); State v. Northwestern Vocational Institute, 232 Minn. 377, 45 N.W.2d 653 (1951) (radio and television repair school—exemption denied).

14. AS 14.17.010, et seq.

15. Alaska Const. art. IX, § 4.

16. Nor do we find the *quid pro quo* policy logically compelling. Even if the education given at a private school (*e. g.*, a trade school) were not substantially similar to that provided in publicly supported schools, some lessening of the state educational tax burden probably occurs from election by students to forego general public education in favor of more specialized training. National College of Bus. v. Pennington County, 82 S.D. 391, 146 N.W.2d 731, 735 (1966). Moreover, where no such tax relief occurs, the public benefit may be most profound since without the private school there would be no such specialized training.

17. We do not say that in all contexts this definition will be of easy application, or even conclusive. However, further refinement is best left to future cases. We also note that art. IX, § 4 of our constitution directs the legislature to define the educational exemption and encourage the exercise of that responsibility.

18. 2 Cooley, Taxation § 672, at 1403–04 (4th ed. 1924); Harmon v. N. Pac. Union Conference Ass'n of Seventh Day Adventists, 462 P.2d 432, 439 (Alaska 1969). The canon is variously stated as a rule of strict construction, a rule that the legislative intent to exempt must clearly appear, and a rule that the burden of proof is on the claimant to show that he falls within the exemption. The last expression seems to come closest to the actual decision making significance of the canon, although it may seem somewhat anomalous to apply a rule normally used for the resolution of factual uncertainty to the problem of statutory ambiguity. The canon is an aid to, not a substitute for, statutory interpretation; the interpretation must still be a reasonable one.

19. That policy derives its origin from the obvious conflict between an exemption statute and the necessity of insuring a broad base of taxation. Given this conflict, courts will not utilize the public policy behind the exemption statute to extend its coverage beyond what is clearly included on the face thereof.

Under our statute once it is determined that the institution involved is nonprofit in character and that the property is exclusively used for educational purposes, the exemption attaches. The legislature has directed that the exemption be available to "all" such properties; it did not see fit to add limitation or qualification. Because the Trust Fund is an institution falling within the broad terms of the constitution and the statute, there is no occasion for employing the canon of strict construction.[20]

■ Turning to the apprenticeship training program, it is clear that the property at issue qualifies for exemption. It would be difficult to characterize the training given as anything but formal and educational. Moreover, not only is the Trust Fund itself nonprofit, but the students of the school pay no tuition. Nor are students chosen from any special groups in Alaska. Nevertheless, appellant denies the accrual of public benefit, arguing that "[t]he primary function of [a]ppellee is to supervise the operation of an apprentice training program for the benefit of the electrical industry and the Union." We deem the arguable lack of eleemosynary motives on the part of the school's sponsors inconsequential.[21] The purpose of the exemption statute is to encourage the establishment of privately supported nonprofit educational institutions; the motivation for their establishment is largely irrelevant. Here, the general public is clearly benefited both by the increased opportunity for Alaskans to obtain vocational training not otherwise available, and by the increased quality of service from a skilled trade.

The judgment of the superior court is affirmed.

20. National College of Bus. v. Pennington County, 82 S.D. 391, 146 N.W.2d 731, 736 (1966); Wilson's Modern Bus. College v. King County, 4 Wash.2d 636, 104 P.2d 580, 584 (1940). *Compare* Harmon v. N. Pac. Union Conference Ass'n of Seventh Day Adventists, 462 P.2d 432 (Alaska 1969) where this court narrowly construed statutory language particularizing the "religious purposes" exemption.

21. Motivation is a particularly subjective and complex notion, the determination of which would be an ill-advised basis upon which to base a determination of property tax exemption.