88 P.3d 124 (2004)
FAIRBANKS NORTH STAR BOROUGH, Appellant/Cross-Appellee,
v.
DENÁ NENÁ HENASH a/k/a Tanana Chiefs Conference, Inc., Appellee/Cross-Appellant.
Nos. S-9849, S-10029.
Supreme Court of Alaska.
April 2, 2004.
*126 A. René Broker, Assistant Borough Attorney, for Appellant/Cross-Appellee.
Michael J. Walleri, Law Offices of Michael J. Walleri, Fairbanks, for Appellee/Cross-Appellant.
Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

OPINION
EASTAUGH, Justice.

I. INTRODUCTION
Tanana Chiefs Conference, Inc. (TCC), also known as Dená Nená Henash, is a regional Native nonprofit corporation that uses its properties in the Fairbanks North Star Borough to provide health, social, community development, and similar services throughout Interior Alaska. When TCC sought charitable-purposes tax exemptions for some of its properties, the borough assessor denied TCC's applications, finding that TCC's programs were largely funded by government contributions and that TCC's receipts usually exceeded the cost of operating its programs. TCC appealed and the superior court reversed, ruling that six of TCC's parcels were wholly or partially exempt. The borough and TCC both appeal. We conclude that TCC's properties were not altogether ineligible for charitable-purpose exemptions, and that the assessor should have granted most of TCC's exemption applications. We therefore affirm the decision of the superior court.

*127 II. FACTS AND PROCEEDINGS
Tanana Chiefs Conference is a regional Native nonprofit corporation organized under the Alaska Native Claims Settlement Act.[1] It represents forty-three Interior Alaskan Native communities and qualifies for exemption from federal income tax.[2] TCC owns several properties in the Fairbanks North Star Borough, including the six-story TCC building, the TCC Annex (the BESCO building), and the Paul Williams House. Among other things, TCC offers medical services and conducts lands management, tribal government assistance, and natural resources programs at these properties.
Village councils select forty-three representatives for TCC's board of directors, which elects a nine-member executive board. The corporation has five major divisions: Administration and Finance, Planning and Development, Health Services, Native Services, and Subregional/Village Programs. TCC's programs are funded largely through its contracts with the federal and state governments. These contracts support TCC's dental and eye services, mental health services, community services for women and children, economic and business support for members of the community, and sanitation maintenance training. TCC's base funding comes from contracts with the Bureau of Indian Affairs and the Indian Health Services under the Indian Self-Determination Act, 25 U.S.C. § 450 et seq.
In 1996, 1997, and 1998 federal and state government sources provided about ninety percent of TCC's program funds. The remainder of TCC's funding came from what TCC calls "self-generated money," including interest and investment income, rental income, and program income from third-party insurers, Medicare, and Medicaid.
Real property exclusively used for "non-profit... charitable purposes" is exempt from municipal property tax in Alaska.[3]
In March 1997 TCC filed ten appeals with the borough assessor seeking exemptions from real property taxation for the BESCO building, the Paul Williams House, and five floors of the TCC building. TCC sought these tax exemptions on the ground it used these properties to provide services for "charitable purposes." TCC acknowledged that some of its property is taxable, and only sought exemption for the tax lots in dispute here. The assessor denied tax-exempt status for each parcel in July 1997 and declined to apportion the space for any of the parcels between exempt and non-exempt uses.
TCC appealed the assessor's denial to the superior court, which remanded to the assessor for further proceedings because the court held that the assessor had not made specific findings of fact. On remand, the assessor conducted a hearing and entered findings of fact and conclusions of law. The assessor again denied TCC's exemption requests for each parcel.[4] TCC again appealed the assessor's decision to the superior court.
*128 In a thoughtful memorandum decision issued November 17, 2000, Superior Court Judge Richard D. Savell thoroughly reviewed the record, the assessor's findings and conclusions, and the pertinent constitutional and statutory provisions and case law. The superior court first rejected the borough's argument and the assessor's conclusion that receipt of government funding precluded any exemption. The court then examined the use of each contested parcel to determine its eligibility for tax exemption. Concluding that the assessor's denials as to six of the disputed parcels lacked a reasonable legal basis, the superior court reversed in whole or in part the assessor's rulings as to those parcels. The superior court then awarded TCC about forty percent of its attorney's fees.
The borough argues on appeal that no part of TCC's properties should be exempt from taxation. It therefore asks us to reverse those parts of the superior court decision that found some of TCC's parcels to be tax-exempt. TCC's cross-appeal asks us to reverse the superior court decision to the extent it affirmed the assessor's denial of TCC's exemption applications for two of the parcels. TCC's cross-appeal also argues that the superior court erred by failing to award TCC full reasonable attorney's fees; it argues alternatively that TCC should receive seven-eighths of its attorney's fees.

III. DISCUSSION
A. Fairbanks North Star Borough's Appeal: Was TCC Entitled to Any Exemption for a Charitable Purpose?

1. Standard of review
Because the superior court, as the intermediate appellate court, did not conduct a trial de novo on appeal, and made no findings of fact of its own,[5] we independently review the decision of the borough assessor.[6] The borough asserts that its "argument ultimately rests on an interpretation of `charitable purposes.'" It asks us to interpret the charitable-purposes tax exemption to be inapplicable if the property owner receives "full compensation for its services through a combination of government contracts, third-party insurers, and participant fees, and ... consistently earns more income than it expends...." This argument requires us to interpret the Alaska Constitution, the Alaska Statutes, and case law. As to this argument, we consequently review the assessor's decision under the "substitution of judgment test" and do not defer to the assessor's administrative expertise.[7] To the extent the borough's arguments require review of the assessor's factual findings, we apply the "substantial evidence" standard of review.[8]
The main question involved in this case is one of law to which "we apply our independent judgment and adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[9]
*129 Taxpayer exemptions are strictly construed against the taxpayer and in favor of the taxing authority.[10] The burden of proving eligibility for an exemption is on the taxpayer.[11] The policy underlying the rule of strict construction and the burden of proof is:
All property is benefited by the security and protection furnished by the State, and it is only just and equitable that expenses incurred in the operation and maintenance of government should be fairly apportioned upon the property of all.[12]
Boards of equalization may spatially apportion exempt from nonexempt uses of a building and tax the nonexempt space. In all contested cases boards of equalization are required to make findings of fact sufficient to explain the reason for their decisions.[13] Such findings are reviewed deferentially and will be affirmed if they are supported by substantial evidence.[14]

2. Charitable-purpose exemption analysis
Per article IX, section 4 of the Alaska Constitution, property is exempt from taxation in Alaska if it is "used exclusively for non-profit ... charitable purposes, as defined by law...." Section 4 provides in relevant part:
The real and personal property of the State or its political subdivisions shall be exempt from taxation under conditions and exceptions which may be provided by law. All, or any portion of, property used exclusively for non-profit religious, charitable, cemetery, or educational purposes, as defined by law, shall be exempt from taxation. Other exemptions of like or different kind may be granted by general law. All valid existing exemptions shall be retained until otherwise provided by law.[15]
Alaska Statute 29.45.030(a)(3)[16] and Fairbanks North Star Borough (FNSB) Ordinance 3.08.020[17] are substantially similar to article IX, section 4, but do not include the "as defined by law" clause.
"A taxpayer claiming a tax exemption has the burden of showing that the property is eligible for the exemption. Furthermore, the courts must narrowly construe statutes granting such exemptions."[18] But, as the superior court observed, "[t]his canon of strict construction `is an aid to, not a substitute for, statutory interpretation; the interpretation must still be a reasonable one.'"[19] *130 The borough asserts that none of TCC's properties is eligible for a charitable-purposes exemption. It ultimately founds this assertion on the assessor's factual finding that TCC is fully, or more than fully, remunerated for its services by federal and state government funding, medical insurance payments, and its investment and rental income. It asks us to read the charitable-purposes exemption in light of three proposed eligibility requirements, and thus argues that TCC's activities are not for charitable purposes because they (1) do not provide the public with a gift or significant benefit, (2) do not lessen a governmental burden, and (3) do not subsidize a socially worthy activity.[20] The borough's opening brief attributes considerable importance to the fact that government payments fund a very substantial part of TCC's services: "TCC's use of its property to fulfill government contracts and perform service for which it is fully paid ... by government... does not constitute charitable use of its property." Its reply brief refines its argument in the following terms: "It is not the source of the support but the amount of the support (i.e., full remuneration for services) that disqualifies TCC from charitable tax-exempt status." A heading in its reply brief states that "Charity Can and Does Exist with Government Support."
TCC responds that the controlling factor in determining eligibility for Alaska's charitable-purposes exemption is the property's actual use. It argues that Alaska precedent does not support the three requirements the borough proposes, and that the programs TCC conducts at its properties satisfy Alaska's charitable-purposes exemption. TCC concedes on appeal that it received about ninety percent of its funding from the federal government during the relevant tax years, but argues that the source of funding does not determine charitable-purposes eligibility in Alaska.

a. How we analyze exemption claims
The relevant constitutional and statutory provisions specify that to be exempt from local taxation, property must be used exclusively for "non-profit religious, charitable, cemetery, hospital, or educational purposes."[21] Our cases have interpreted these provisions to require a two-part inquiry: first, whether there is a nonprofit, charitable purpose, and second, whether the property is being exclusively used for an exempt purpose.[22]
As to the first of these, we read "non-profit" to impose a substantive qualification that is not identical to the "charitable purposes" requirement, both because the constitutional delegates included the "non-profit" qualifier in article IX, section 4 despite the absence of that qualifier in the existing territorial exemption statute,[23] and because we interpret the words of the constitution to avoid rendering any words superfluous.[24]
The "non-profit" qualifier modifies "purposes," and the constitution does not expressly refer to the organization that owns or uses the property. In discussing eligibility, the primary exemption provisions do not refer to owner or user organizations.[25] This suggests that the focus under the primary exemption provisions is on the purpose of the use, not on the organization.
*131 We note that AS 29.45.030(c) requires that if property, otherwise eligible for exemption under subsections .030(a)(3) and (4), generates "income," the organization using the property must be a "nonprofit ... charitable... group[ ]."[26] We applied the predecessor of subsection .030(c) in Greater Anchorage Area Borough v. Sisters of Charity of the House of Providence, and affirmed the denial of an exemption for three income-generating floors of the owner's medical building.[27] The medical center's owner arguably had the purpose of operating a nonprofit hospital. But it received rental income from physicians who used office space on those floors to conduct their private medical practices. Because the actual users of these income-generating properties were not nonprofit charitable groups, AS 29.45.030(c) deprived the properties of any exemption they otherwise would have received under AS 29.45.030(a)(3) or (4). Thus, unlike subsections .030(a)(3) and (4) which look to the nature of the owner's purposesubsection.030(c) looks to the nature of the user.
It is not clear whether subsection .030(c) would apply here. The borough does not rely on it and the assessor did not base the exemption denial on that subsection, possibly because it is not clear that subsection .030(c) applies if the "group" using the property is also the owner seeking the exemption, and possibly because it is not obvious that the governmental support TCC received can be considered "income." Certainly there is no dispute before us about TCC's status as a nonprofit organization. The assessor found that TCC was a nonprofit organization. The borough does not take issue with this finding, and does not assert on appeal that TCC was operating in violation of the Internal Revenue Code or its own articles and bylaws. TCC's § 501(c)(3) nonprofit status for purposes of the Internal Revenue Code[28] is not necessarily determinative, although its status and corporate purposes are consistent with finding the purposes to be nonprofit.
The borough does argue that TCC was not acting as a charity, but makes that argument only in context of its claim that TCC used its property for "contractual," not "charitable," purposes. The borough does not assert that subsection .030(c) applies here. As the borough recognizes, its "argument ultimately rests on an interpretation of `charitable purposes.'"
Consequently, the question raised by the borough in this appeal is whether TCC was motivated by "charitable purposes," not whether TCC itself was a "charity."
We therefore next look to the purposes for which the parcels were used. The record confirms that the assessor did not err in finding that the programs TCC conducted on those parcels generated a surplus in most years. And as to one of the parcels, the assessor found that TCC had engaged in lease activity that "results in a profit" to TCC with respect to the Fairbanks Community Mental Health Clinic. But we think it significant that the assessor did not find that the other disputed parcels were not used for nonprofit purposes. The fact that use of a given parcel created an operational surplus does not necessarily preclude a conclusion that the activity had a nonprofit purpose. That a given charity manages, through effective fund-raising and careful management, to generate a surplus while carrying out its charitable purposes does not necessarily deprive the charity of a property tax exemption.
Our decisions have previously discussed this nonprofit qualifier only briefly, and have translated it to mean that a property generating income will not lose its exemption if payment is "not sought as a result of a dominant profit motive."[29] *132 We conclude that the nonprofit qualifier does not require us to affirm the assessor's decision denying all of TCC's exemption applications. (We will return to the question of profit motive in Part III.B.2, when we consider TCC's cross-appeal concerning exemptions for two specific parcels.)
Most of our charitable-purposes tax exemption cases revolve around the second part of the analysis: whether the property is being used exclusively for a charitable purpose. We have interpreted "exclusive use" to require that all uses of the property be for the "direct and primary" exempt purpose.[30] Although the exclusive-use requirement precludes temporal apportionment if property is used for both exempt and nonexempt purposes, we recognized in Catholic Bishop that the constitution allows spatial apportionment.[31] Accordingly we have concluded that operation of a church radio station that sold commercial radio time was not an exclusive use of property for a religious or charitable purpose.[32] In so holding, we did not think it relevant that the radio station's income was used to fund missionary activities. We have also held that a hospital did not use its property exclusively for hospital purposes because it leased the property to doctors for private office space.[33] We recognized an exception to the exclusive-use requirement in City of Nome v. Catholic Bishop of Northern Alaska, in which we held that de minimis use of property for a non-exempt purpose did not preclude an exemption.[34] The exclusive-use requirement also requires analysis of how the property is actually used.
The eligibility analysis in this case ultimately turns on the meaning of "charitable purposes" in Alaska. Noting that neither the constitution nor AS 29.45.030 defined "charity" or "charitable," in Matanuska-Susitna Borough v. King's Lake Camp we approvingly quoted this statement as typifying the "broad scope" given to these terms:
It is quite clear that what is done out of good will and a desire to add to the improvement of the moral, mental, and physical welfare of the public generally comes within this meaning of the word "charity." To crowd out coarseness, cruelty, brutality from social man undoubtedly results in this betterment.[35]
We later characterized this statement as "the broad common law definition of `charity' " and observed that this definition reflects the "humanitarian rationale" of property tax exemptions: they are granted "as an aid or encouragement to individuals, corporations, or businesses, to do something supposedly for the good of the community at large, although such an act is not itself a proper or even permissible function of the government."[36] This definition provides some guidance, but it does not purport to specify prerequisites for eligibility. It provides only a general framework for determining eligibility. Applying this framework, we have concluded that properties used for a youth summer recreational camp,[37] a youth hostel,[38] and a church radio station[39] were being used for charitable purposes.
Our "charitable purposes" doctrine also requires analyzing whether the property sustains activities motivated by a "dominant profit motive."[40] This factor parallels the *133 nonprofit requirement discussed above. Exemption is foreclosed if there is a "real profit motive" in the undertaking.[41]
We considered the effect of deriving income from property in King's Lake Camp and Catholic Bishop. We held that property will not lose an exemption even if payment is received for the use of the property if (1) the property is used exclusively for exempt purposes; (2) the payment is not sought as a result of a dominant profit motive; and (3) the payment is both incidental to and reasonably necessary for the accomplishment of the exempt activity and does not exceed operating costs.[42] We have applied this test in cases involving user fees,[43] rental income,[44] and donations.[45]
b. Source of funding and "government contractor" status
Neither the constitution, the statute, nor the borough's ordinance mentions source of funding as a factor controlling or bearing on the exemption right. Nor have our decisions addressed what effect receipt of government funds may have on exemption eligibility. Our property tax exemption cases have primarily turned on whether the property was actually used exclusively for an exempt purpose.[46]
The superior court understood the borough to be arguing below that none of the TCC properties was exempt because the government was the source of most of the funding for TCC's programs. The superior court treated this "source of funding" argument as a threshold issue and held that receipt of government funding did not preclude exemption.
The borough does not squarely advance a government "source of funding" argument here. It asserts, especially in its reply brief, that it is not arguing that substantial government funding is a complete disqualifier. It is therefore not necessary for us to consider whether the superior court erred as a matter of law in holding that it is not.
The borough nonetheless argues that TCC was acting as a government contractor, and was therefore acting not to fulfill charitable purposes, but to satisfy its contractual undertakings to the government. And it argues that substantial government funding remains relevant to the charitable-purposes analysis it proposes.
Courts elsewhere are split on whether substantial government funding affects eligibility for charitable-purpose exemptions. Some hold that substantial government funding precludes an exemption, and some do not. These results may turn on considerations that do not apply in Alaska. For example, in many of the jurisdictions that have held that receipt of government funding precludes a charitable-purpose exemption, the courts were bound by a statutory or constitutional framework that required the organization to be a public charity,[47] or they applied multi-factor *134 tests valuing support provided by donations.[48] It may also be significant that some cases in which receipt of government funding rendered property ineligible, federal grant money was used to construct low-income housing and subsidize rent.[49]
In contrast, many of the cases upholding exemptions despite government funding involved corporations that provided services to their beneficiaries.[50] In some jurisdictions that have adopted multi-factor tests that consider source of funding, courts have not distinguished between government funding and donations.[51] We find this latter group of cases to be more persuasive.
Rather than argue that government funding is a complete disqualifier, the borough argues that TCC was a "government contractor," and therefore did not act for charitable purposes. Assuming that TCC was a government contractor, we decline to hold that its government contractor status necessarily renders its property altogether ineligible for any exemption. Such a status would not necessarily be inconsistent with finding that the property was used exclusively for "non-profit... charitable ... purposes."[52]
In any event, the government's financial support for TCC is largely provided through the Indian Self-Determination and Education Assistance Act (the Self-Determination Act).[53] The unique relationship between the federal government and Indian tribes has long led the government to provide support to tribes for health, education, employment, irrigation, administration, and real estate services.[54] These services encompass a wide variety of activities, some of which are traditionally governmental and some of which resemble those conducted by private business. The federal government's purpose of satisfying its trusteeship responsibility is essentially charitable, i.e., is motivated by "good will and a desire to add to the improvement of the moral, mental, and physical welfare of the public generally."[55] The Self-Determination Act confirms the federal government's trust responsibility.[56] The act *135 has the purposes of improving the provision of federal services by making them more responsive to tribal needs, and improving the functioning of the tribes through increased self-government.[57] Thus, Self-Determination Act contracts are not merely conduits for federal funding that would be provided in any event. By reorganizing the services and their provision, the contracts permit tribes to "improve[ ] ... the moral, mental, and physical welfare" of individuals and the group.[58] We also note that TCC contends that it acts on behalf of several native villages that may be too small to administer Self-Determination Act contracts themselves. We conclude that TCC's activities in satisfying its Self-Determination Act contracts with the government are motivated by purposes that are properly characterized as charitable. This satisfies the charitable-purposes criterion for exemption in Alaska.

c. Other possible factors
The borough contends that because TCC receives full compensation for its services through a combination of "government contracts, third-party insurers, and participant fees" and operates with a surplus, TCC's property does not qualify for a charitable exemption. Thus, it asks us to add additional factors to our charitable-purpose analysis: whether the property's use provides a gift or significant benefit, lessens a governmental burden, and subsidizes a socially worthy activity. TCC responds that Alaska's charitable exemption analysis focuses only on whether the property is used for a nonprofit and charitable purpose. Thus, TCC concludes that the borough's proposed factors are contrary to Alaska law.
Our constitutional and statutory exemption provisions do not catalogue all factors that might define eligibility for charitable-purpose exemptions.[59] It is not desirable, assuming it were possible, for us to attempt to identify in context of this case all factors that should determine exemption eligibility in future disputes. We therefore decline to adopt the borough's proposed factors as comprising a comprehensive or dispositive test that would control charitable-purpose analysis. Rather, we think it is appropriate to consider any circumstance relevant to whether a particular property owner has satisfied the constitutional and statutory standard. The circumstances the borough discusses are relevant, but they are not necessarily exhaustive or controlling.
The borough first argues that we should define "charitable purpose" to require "a gift to the general public or a significant public benefit." We separately consider these alternatives.
Significant public benefit. The Alaska Constitution, the Alaska Statutes, and the borough's ordinance do not precondition charitable-purpose exemption eligibility on use providing a "significant public benefit." Nonetheless, our broad common law definition of charity contemplates some public benefit. That definition states, "It is quite clear that what is done out of good will and a desire to add to the improvement of the moral, mental, and physical welfare of the public generally comes within the meaning of the word `charity.'"[60] This concept of charityas an activity that improves public welfarereflects the public policy behind tax exemptions. We noted generally in Sisters of Providence in Washington, Inc. v. Municipality of Anchorage that "exemptions are granted as the quid pro quo for non-profit contributions of services and aid to society in general."[61]
Charitable activities provide a public benefit whether or not the beneficiaries are indigent.[62] Programs that serve only a portion of the community can also "add to the improvement of the ... welfare *136 of the public generally."[63] Thus, in McKee v. Evans, we upheld an educational-purpose exemption for property used for a vocational training program for union apprentices.[64] We held there that educational-purpose tax exemptions require a "substantial public benefit."[65] We observed that "the general public is clearly benefited both by the increased opportunity for Alaskans to obtain vocational training not otherwise available, and by the increased quality of service from a skilled trade."[66]
We therefore conclude that a use providing a public benefit indicates that the property is being used for a charitable purpose.
Gift to the general public. The borough also argues that charity requires a "gift to the general public." (Emphasis added.) In support of its argument, the borough cites King's Lake Camp, which quoted Lord Camden, an eighteenth-century chancellor of England, who defined charity as "[a] gift to a general public use, which extends to the poor as well as to the rich."[67] The borough defines "gift" as something "bestowed voluntarily and without compensation." It argues that "a gift to the community simply requires that ... some material gap exists between what TCC receives and what it gives." It also contends that "[i]t is not the source of the support but the amount of the support (i.e., full remuneration for services) that disqualifies TCC from charitable tax-exempt status." Thus, the borough argues that because TCC receives full compensation for its services through government funds and other receipts, it should not qualify for an exemption.
The exemption provisions in the constitution, statutes, and ordinances do not precondition exemption eligibility on whether the property supports programs that are fully funded from such outside sources as the government. We have never interpreted charitable purpose to require, as the borough proposes, a "material gap" between what the charity gives and what the charity receives.
Rather, our decisions have recognized that the existence of a gap between what the beneficiary pays and the value of the services the beneficiary receives could be evidence of a charitable purpose. We held that operating a youth hostel that provided temporary lodging for travelers for a low daily fee was a "gift to the general public," because we concluded that "although some who stay at the Hostel are not needy and could pay more, no one is turned away if the fees are not paid."[68]
Although providing services free of charge is evidence of a charitable purpose, we have not explicitly conditioned charitable purpose eligibility on whether the property supports programs that are free to those who cannot pay. Thus, we have held that properties supporting programs that charge a user fee were exempt, as long as the user fee is "not inspired by a dominant profit motive" or does not exceed operating costs.[69]
Our charitable-purpose exemption cases have not required that there be a "material gap" between what TCC receives and what it gives. The borough argues that TCC does not provide a gift to the community because even if the beneficiary is not paying TCC for its services, the government is compensating TCC for the services it provides. Thus, the borough concludes that TCC's service is not gratuitous and not a gift to the community. The borough's argument implies that only entities whose receipts do not cover all of their operating costs are eligible for charitable-purpose exemptions.
*137 We hold that whether a nonprofit organization receives outside funding allowing it to provide services at reduced cost or no charge to the community does not determine whether property is being used for a charitable purpose. Our cases establish that receipt of payments or compensation for using the property is not fatal to a charitable-purpose exemption.[70] An otherwise exempt property that generates revenue will not lose its exemption if (1) payment is not sought as a result of a dominant profit motive; (2) payment is both incidental to and reasonably necessary for the accomplishment of the exempt activity; and (3) payment does not exceed operating costs.[71]
Lessening a governmental burden. The borough argues next that charitable-purpose eligibility should require the lessening of a governmental burden. It contends that by receiving substantial government funding for activities the government is obligated to perform, TCC does not lessen a governmental burden.[72] The borough argues that charitable tax exemptions are justified because charitable entities perform functions that governmental institutions would otherwise be obligated to perform.
Our constitution and statutes do not mention lessening of a governmental burden as a factor in charitable-purpose analysis, nor do our cases. Although we generally acknowledge that tax exemptions are granted to compensate those who give "nonprofit contributions" to the general public,[73] we have never conditioned tax exemption eligibility on whether an organization reduces a governmental burden by either providing services the government would otherwise have to perform or supporting its services without government funding. In McKee v. Evans, we granted an educational-purpose exemption for property used for electrician apprenticeship training.[74] We considered there whether relieving a governmental burden was relevant to educational-purpose analysis under article IX, section 4 of the Alaska Constitution and former AS 29.10.336(a).[75] We rejected an argument that school properties qualifying for the educational-purpose exemption must provide programs similar to those offered at state institutions.
The rationale for this [proposed] limitation is that only such school properties as relieve some substantial educational burden from the state should receive rights of tax exemption. Although this quid pro quo reasoning has superficial appeal in a period of financial crisis for local government, we find it unconvincing.[76]
We also concluded that it was within the legislature's province to decide whether eligibility for an educational-purpose exemption should require a lessening of governmental burden:
In Alaska the power of deciding what types of education are to be publicly supported... by tax exemption, is vested with the legislature. AS 29.10.336 in no way delimits the term "educational purposes" and we see no justification for this court to give to that term anything other than its ordinary meaning.[77]
The borough reasons that because TCC receives substantial and direct government funding, its programs do not lessen a governmental burden. The borough argues that because TCC receives most of its funding from the government, the government is already assuming a large burden. Thus, it claims, TCC need not receive further subsidy in the form of a tax exemption.
But as the borough elsewhere concedes, receipt of some government funding is not *138 necessarily inconsistent with a charitable purpose. We decided above that government funding is not necessarily determinative. And precluding tax exemptions if government funding is "substantial" potentially encourages trivial and arbitrary attempts to determine what precise amount or percentage of support renders property ineligible for a charitable exemption.
The borough acknowledges that the mere existence of some governmental subsidy or other direct governmental support does not automatically destroy eligibility. But it contends that because TCC receives most of its funding from government, TCC is merely a government contractor, not a charity. Whether an organization is a "government contractor" may be relevant to whether it has a dominant profit motive or a nonprofit purpose, but it does not conclusively establish that the property is not being used for a charitable purpose. The borough's contention seems ultimately to stand on an argument it claims it is not makingthat government funding is a complete disqualifier.
In a related argument, the borough argues that charitable exemptions should "indirectly subsidize socially worthy activities." It asserts that the practical effect of tax exemptions is to "make all taxpayers indirect subsidizers of the institution" receiving the exemption. Thus, the borough argues that there is no need for local taxpayers to indirectly subsidize an organization that already receives government funding. It claims that granting an exemption to programs that are already funded by the government shifts "part of the cost of providing the service from one government to another."
The borough's "shifting-the-tax-burden" argument raises policy questions that are of little help to courts applying the constitutional and statutory exemption provisions. Moreover, government property is not subject to borough taxation anyway,[78] so whether the government directly operates a local program or "subsidizes" it would seem to have little effect on the local tax base. And because programs like TCC's broadly benefit many borough residents, it is not obvious that there is anything inappropriate about transferring to local residents some of the cost (the loss of some property tax revenues) of conducting these programs. But to the extent granting these exemptions shifts some federal tax burden to local property owners, that effect does not convince us that we should interpret Alaska law to deny TCC the disputed exemptions. To the extent state statutes control municipal taxation of TCC's property, the legislature can address any perceived imbalance in taxpayer burdens.[79]
Operating surplus. We next consider whether, as the borough asserts, TCC's operating surplus renders TCC ineligible for a charitable-purpose exemption. Our cases hold that an otherwise exempt property that generates revenue will not lose its exemption if (1) payment is not sought as a result of a dominant profit motive; (2) payment is both incidental to and reasonably necessary for the accomplishment of the exempt activity; and (3) payment does not exceed operating costs.[80]
We have never decided whether an operating surplus precludes an exemption. Although we require that payment not exceed operating costs, that requirement should not disqualify property owned by successful fundraisers. We hold that an operating surplus will not preclude an otherwise valid tax exemption so long as revenue is not *139 generated out of a dominant profit motive and revenue is allocated only to support exempt purposes. Our Part III.A.2.a discussion of the nonprofit qualifier also pertains here. That TCC conducted its charitable programs while achieving an operating surplus in the applicable tax years does not make TCC ineligible for any exemption for those years. It makes little sense to endorse a rule that would encourage charities to operate at a deficit just to ensure tax exemption eligibility.
Although we decline to treat as dispositive the circumstances the borough finds controlling, we have considered them to the extent they are relevant to the "charitable-purposes" inquiry that determines this appeal. We conclude that they do not render TCC's properties altogether ineligible for exemption.
B. TCC's Cross-Appeal: Did the Superior Court Err in Denying Exemptions for the Fifth Floor (Used for Community Service Programs) and Sixth Floor (Used for Administration) and Apportioning TCC's Attorney's Fees?

1. Standard of review
TCC's cross-appeal argues that the superior court erred by denying exemptions for portions of the fifth and sixth floors of the TCC building. In denying exemptions for those parcels, the superior court relied on the assessor's findings of fact and conclusions of law. As to the fifth floor, the superior court implicitly invoked the reasonable basis standard of review and held that it could not conclude that the assessor's decision lacked a legal and factual basis. As to the sixth floor, the court apparently drew its independent conclusions about whether TCC's administrative activities supporting both exempt and nonexempt programs satisfied the requirement that the property be used "exclusively" for charitable purposes.
We conclude that the substantial evidence standard controls review of the assessor's rulings with respect to both the fifth and sixth floors to the extent the rulings involve findings of fact. We apply the substitution of judgment standard in reviewing the assessor's legal conclusions.[81]

2. Fifth floor
The fifth floor of TCC's main building housed various community programs providing family services, Indian child welfare, self-governance, planning, village government credit and finance, and employment services. The assessor denied an exemption for the family services programs because the programs "appear to be fully funded by the state and federal government." The assessor also found that the village government services and credit and finance activities did not qualify as activities "adding to the moral, mental, and physical welfare of the public generally." The assessor found that these latter programs involved "attempts to economically benefit certain businesses...." The assessor consequently denied an exemption for the entire fifth floor.
Having determined that receipt of government funding was not a valid factor in analyzing eligibility for a charitable-purpose exemption, the superior court held that only the fifth floor family services and employment programs, which were funded by state and federal government, qualified for exemption. The superior court determined that thirty percent of the fifth floor was used for these programs. The remainder was subject to taxation. (The superior court calculated this spatial allocation after reviewing an exhibit and finding that 3,500 square feet of the 11,570 square-foot fifth floor were used for exempt purposes. Neither TCC nor the borough asserts on appeal that the court erred by making this calculation rather than remanding to the assessor.)
As to the remaining seventy percent of the fifth floor, the superior court upheld the assessor's conclusion that this portion of the property was used for business loan programs and village government services and therefore did not qualify for exemption. In the words of the superior court, those programs are "geared more toward providing assistance to governmental and tribal entities *140 in the performance of what are traditional government services."
TCC argues that the superior court erred by denying an exemption for the portions of the fifth floor used for these services. It asserts that the fifth floor programs that were denied an exemption by the superior court "add to the moral, mental and physical welfare of the public generally." It contends that other courts have identified community programs promoting environmental health, agriculture, housing, economic and community development, and self-governance as charitable activities. It further argues that community services are just as charitable as "individual-based" services.
TCC also contends that programs that perform "traditional government services" are not ineligible for a charitable-purpose exemption, and that government services may promote charitable purposes. In support, it cites Southwestern Oregon Public Defender Services, Inc. v. Department of Revenue, in which the Oregon Supreme Court held that a nonprofit organization providing legal services to indigent criminal defendants, a typical government service, was engaged in charitable activity.[82] TCC further notes that in states that require a charity to lessen a governmental burden, charities must provide a traditional governmental service to qualify for a charitable exemption.
The borough responds that the disputed programs do not "add to the moral, mental, and physical welfare of the public generally." It contends that these programs provide distinctly government and political services and are therefore not conducted for charitable purposes. It argues that the functions TCC performs, such as constitution and ordinance drafting, licensing, and other legislative duties, are political governmental activities, not charitable activities.
The borough also states that not all government functions qualify as charitable, and that expanding the definition of charitable purposes to include all government functions would render the separate government exemption superfluous. The borough concludes that the term "charitable purpose" must be construed narrowly.
We do not disagree with TCC's contention that property used to provide "traditional government services" is not necessarily ineligible for exemption. But that was not the only basis for the assessor's ruling. Rather, he ruled that these services "do not involve activities adding to the moral, mental, and physical welfare of the public generally. Instead, they involve attempts to economically benefit certain businesses (Credit and Finance), provide for economic development of certain areas (Planning), and technical assistance to tribal entities like drafting ordinances and constitutions (VGS)." We cannot say that these findings and conclusions lack a legal and factual basis. And whether or not these are traditional government services, it is not evident that they necessarily have "charitable purposes." In the words of the superior court, "narrowly construing the exemption and holding TCC to its high burden," we cannot say that the assessor erred by failing to exempt the parcels used for these purposes.

3. Sixth floor
In granting an exemption for only thirty-four percent of the sixth floor, the superior court held that the administrative offices supported both exempt and nonexempt activities and that "[n]onexempt activities include[d] fund-raising, lobbying, and political activity, as well as economic development and commercial loan programs."
TCC first argues that fund-raising should not deprive a charity of a tax exemption. It reasons that fund-raising is necessary for a charity's survival and is directly incidental to and vitally necessary to a charity's activities. TCC also argues that a nonprofit entity which receives rent or income should not be disqualified from receiving an exemption.
The borough argues that fund-raising is not a charitable-purpose activity. In support, it cites Evangelical Covenant Church of America v. City of Nome, in which we held that a church radio station that sold commercial *141 radio time to raise money for church activities was not exclusively using the property for charitable purposes.[83] We there noted: "It matters not that only a part of the radio time was sold and used for commercial purposes and that the profits derived from the sale of commercial radio time were used to further the missionary work of Covenant Church."[84]
TCC responds that operating the radio station in Evangelical Covenant Church differed from TCC's fund-raising efforts because it claims the radio station was a "charitable feeder" activity. TCC defines a "charitable feeder" activity as "commercial activity conducted by a non-profit entity in which the profit from the enterprise is used to support and fund the charitable activity." TCC argues that there is a distinction between commercial feeder activity and its solicitation of donations and grants, which it characterizes as "passive fund-raising." It argues that the appropriate test is whether the activity is necessary and incidental to carrying out a charitable purpose.
Although we recognize that fund-raising can be for charitable purposes, it loses its eligibility for exemption if it is used to support both exempt and nonexempt services, i.e., if it is not conducted exclusively for a charitable purpose.[85] The assessor found that the administrative services supporting exempt and nonexempt programs were not used exclusively for charitable purposes. The superior court relied on that finding in classifying the fund-raising as nonexempt when the court spatially apportioned the sixth floor to determine the part entitled to exemption. It did not commit legal error in doing so. TCC has not demonstrated on appeal that the facts compel application of either of the recognized exceptions to the "exclusive use" rule.[86] We consequently discern no error in the superior court's spatial apportionment on the basis of the fund-raising activity.
TCC next argues that the superior court should not have classified TCC's lobbying activities as nonexempt. It reasons that a nonprofit agency should not be denied a charitable purpose exemption because it "conducts activity that is unpopular or perceived as political...." It also contends that seeking to effectuate a change in the law or in government is no basis for denying a charitable-purpose exemption.
The borough applied the rule, extant in some jurisdictions, that denies charitable exemptions for property used for lobbying.[87]
Given the findings and conclusions of the assessor that TCC's administrative functions serve both exempt and nonexempt purposes, we conclude, for the reasons we discussed in considering TCC's fund-raising activities, that the superior court committed no error in spatially apportioning the sixth floor on this basis and in rejecting TCC's contention that more of the sixth floor should have been exempt.
Finally, TCC argues that economic development programs satisfy a charitable purpose because they contribute to the welfare of the public generally. TCC further argues that private economic development programs, including those lending money to private businesses, achieve charitable purposes. It focuses its discussion on its credit and finance program, which TCC contends "receives funding from the federal and state governments and re-lends the funds to aid business development." TCC argues that *142 the lending program promotes the physical welfare of individuals and rural communities by making financing available "which would otherwise not be available." TCC also notes that because it does not charge for these lending services, the program does not have a dominant profit motive.
The borough responds that because economic development encourages the "production, development and management of material wealth," it does not fulfill a charitable purpose. The borough argues that lending money to for-profit businesses that compete in the marketplace is not charity. The borough also argues that Alaska law does not recognize exemptions for property used for commercial activity of any sort.
We cannot conclude that the assessor's findings and conclusions on this point lack a legal and factual basis. The superior court did not err by failing to find that the area devoted to community economic development was also exempt. That TCC did not charge for its re-lending activity may well mean that it had no dominant profit motive, but it does not compel a conclusion that the activity itself was for charitable purposes.[88]

C. Attorney's Fees
The superior court found that TCC was entitled to tax refunds for 1997, 1998, and 1999 and consequently awarded TCC attorney's fees of $11,384.50 under authority of AS 29.45.500(a).[89] This was about forty percent of TCC's actual attorney's fees. The parties on appeal agree that this percentage apparently corresponded to the percentage of area of the TCC property the superior court held to be exempt.
TCC invokes AS 29.45.500(a) and argues that because the court held that TCC was entitled to tax refunds, the court erred by failing to award TCC the fees it actually incurred and by failing to make fact findings supporting the limited award. TCC observes that the court rejected the borough's contention that all of TCC's properties were ineligible for an exemption.
We agree with the borough's responsive contention that AS 29.45.500(a) only entitled TCC to an award of those attorney's fees it incurred with respect to its successful refund efforts. This is consistent with our case authority concluding that the statute permits an apportionment of fees based on the taxpayer's success.[90]
TCC alternatively argues that it was error to base the fee reduction on the court's spatial apportionment of the disputed properties; TCC asserts that it prevailed on seven of the eight tax parcels in dispute, and that it therefore should have recovered seven-eighths, or 87.5%, of its actual attorney fees.
But we conclude that the superior court did not abuse its discretion in this case by choosing to apportion the fees based on the area it held to be exempt. That method seems at least as fair as apportioning by parcel, a method that arguably might be unfair if parcels significantly differ in size. And TCC does not argue that there is any significant difference in the per-square-foot tax valuations of the parcels, a circumstance that might bear in a given case on the fairness of the apportionment method the court applied here.
We finally observe that no findings of fact are required for an award of attorney's fees *143 in this situation. It is evident how the court calculated the fees, and TCC does not argue that the method the superior court applied cannot be discerned and therefore cannot be reviewed on appeal.

IV. CONCLUSION
For these reasons, we AFFIRM the superior court's memorandum decision of November 17, 2000.
MATTHEWS, Justice, dissenting.
MATTHEWS, Justice, dissenting.
I dissent from today's opinion for reasons that can be summarized as follows. One necessary element of the term "charitable" as used in our tax-exemption statute is that the activity in question must entail a gift to the public. This implies two requirements: first, that the services in question must be given, rather than paid for; and second, that the "gift" have its source in the private sector. Since TCC's services are paid for rather than given, and since they are paid for by the government, they are not charitable. In the paragraphs that follow I will explain these points in more detail.
At the outset I will briefly describe TCC and its activities.[1] TCC is a large and apparently well run nonprofit corporation incorporated under the Alaska Nonprofit Corporation Act. Its members consist of most of the Athabascan villages in the Yukon and Kuskokwim River drainages. Among its stated purposes is "to promote the common welfare of the Natives of Alaska and their physical, economic and social well being."[2] TCC provides health, social, and economic services to Alaska Natives and villages in its region. These services are funded by federal and state government contracts and grants. TCC also receives revenue from interest on contract and grant funds and from billing private and public insurers.
For its fiscal year ending September 30, 1998, TCC's total revenues were $51,791,385. Of that $46,178,114 came from federal grants and contracts, and $5,091,073 came from state grants and contracts. TCC is able to charge the government for the costs of operating the buildings used in carrying out its activities. These costs include property taxes. In some cases TCC is allowed to collect twice for health services that it provides once under its contracts with the federal government and again from public or private health insurers. TCC provides some health services, such as glasses and orthodontia, that are not directly paid for by the government. The surplus generated from collecting twice must be used to provide health services. It covers the cost, and then some, of these services. TCC currently has an accumulated surplus of over $27,000,000. TCC does not rely on donated funds or services.
The statute that governs this case is AS 29.45.030(a)(3) and (c). In relevant part it provides:
(a) The following property is exempt from general taxation:
....
(3) property used exclusively for nonprofit religious, charitable, cemetery, hospital, or educational purposes;
....
(c) Property described in (a)(3) ... of this section from which income is derived is exempt only if that income is solely from the use of the property by nonprofit religious, charitable, hospital, or educational groups....
Since TCC derives incomes from the property that it claims as exempt, both subsections (a)(3) and (c) apply. Thus, the property must be used for charitable purposes and TCC must be a charitable group for an exemption to be granted.
*144 Under Alaska law, exemptions from property taxation must be construed narrowly so that to the extent possible all taxpayers will share equally in the cost of local government.[3] For the same reason the burden is placed on the taxpayer to prove that it is eligible for an exemption.[4]
What then is the meaning of the terms "charitable purpose" as used in AS 29.45.030(a)(3) and "charitable group" as used in AS 29.45.030(c)? Clearly, more than merely a nonprofit purpose or a nonprofit group is required, because "nonprofit" is a requirement separate from "charitable" under these subsections.[5] Our case law establishes that the term has two essential elements. First, charity is "that [which] is done out of good will and a desire to add to the improvement of the moral, mental, and physical welfare of the public generally."[6] Second, charity must entail "a gift to the general public."[7]
In Sisters of Providence in Washington, Inc. v. Municipality of Anchorage, we approved of a quid pro quo rationale as the justification for charitable and other related exemptions: "exemptions are granted as the quid pro quo for nonprofit contributions of services and aid to society in general."[8]
The gift to the public requirement means that services provided by an organization claiming charitable status must be based at least in part on donations of funds, property, or labor. To be charitable, services must be given, rather than paid for. This, in turn, means that they must be based, in a substantial way, on donations.[9] Further, the donations must be from the private sector. Under the quid pro quo model that justifies tax exemptions for contributions of services to the public, government partially pays for charitable services in the form of a tax exemption. But this model breaks down when government has already fully paid for the services in question. When the government through contracts and grants supplies the "quid" for services, the additional consideration *145 that would be supplied by a tax exemption is not required.[10] There are many cases decided in other jurisdictions that reflect these points. I will summarize some of them here, quoting language that is applicable to the present case.
One instructive case is County Board of Equalization of Utah County v. Intermountain Health Care, Inc.[11] Here the Utah Supreme Court recognized, as we have, that "the element of gift" is "crucial to the meaning of charity."[12] The Utah court also recognized that exemptions are founded on a quid pro quo rationale: "These exemptions confer an indirect subsidy and are usually justified as the quid pro quo for charitable entities undertaking functions and services that the state would otherwise be required to perform."[13] In applying the gift to the public test to a nonprofit hospital, the court found that there was no gift because the value of services provided to the patients was equal to the income received from government programs, insurance companies, and patients receiving care. "Collection of such remuneration does not constitute giving, but is a mere reciprocal exchange of services for money."[14] The hospitals at issue donated only a few services, valued at less than one percent of their revenues, and they received little or no support from nongovernmental gifts, donations, or endowments.[15] The court concluded that it could not find on the record presented "the essential element of gift to the community, either through the nonreciprocal provision of services or through the alleviation of a government burden...."[16]
Another case that illustrates the required characteristics of a charitable organization is Waterbury First Church Housing, Inc. v. Brown.[17] Here a nonprofit housing corporation rented apartments to elderly tenants at below-market rates with assistance from the federal government. The Supreme Court of Connecticut ruled that the corporation was not a charitable organization because it did not rely in any substantial way on gifts or gratuities from private sources. The court stated "that an essential characteristic of a charitable organization, besides a charitable purpose, is that it achieve its purpose `through the means of funds derived from the gratuities of the benevolent.'"[18] Observing that an "exempt organization's income [must] be based to some measurable extent on `sums coming from private sources which are spent for the public weal,'" the court concluded that this test was not met since the organization was not "the beneficiary of any gifts from private sources, and the only funds which it has to distribute consist of rental income from its tenants and the federal subsidies which it receives."[19] The court found error in the approach of the trial court that had looked only to the purpose of the organization's activities "without considering whether it achieves its charitable purposes through the use of charitable funds."[20]
Parker v. St. Stephen's Urban Development Corp., Inc.[21] is another case involving a nonprofit corporation that participated in federally subsidized housing programs. The corporation rented apartments to low-income tenants at below-market rates. It was supported by a combination of federal money *146 and tenant rental payments and operated on a break-even basis. The New Jersey court held that the corporation was not engaging in "charitable purposes" under the New Jersey charitable immunity statute. The court reached this conclusion because the corporation did not rely on charitable contributions: "Equally important is the absence from defendant's operation of fund-raising activities and charitable contributions."[22] The court made it clear that government funding is not charitable funding:
Indeed, by the very nature of its operation, defendant contravenes one of the footings of charitable statusundertaking acts by which the government is relieved pro tanto from a burden it would otherwise have to perform. It is the government which pays defendant's mortgage interest, supplies mortgage insurance, and subsidizes the tenants sufficient to meet its operating expenses, including the remaining mortgage payments. Defendant was not created to lessen the burden on government but to obtain as much funding from the government as possible and to operate the project exclusively with that funding.[23]
The court went on to state that government funding per se is not a disqualifying factor. What is required though is significant support through charitable contributions:
This is not to suggest that defendant's activities are not salutary or that its operation with federal funds deserves our disapprobation. Nor is it to suggest that an actual charity which receives a measure of support from the government would be prohibited from claiming immunity. The inquiry in each case should focus on the essence of the entity itself. If a nonprofit corporation is performing a charitable service and is essentially supported through charitable contributions, the fact that it happens to receive some government support would not alter its nature as a charity for immunity purposes.[24]
In Housing Southwest, Inc. v. Washington County, the Supreme Court of Idaho addressed the question whether a private nonprofit corporation that owned federally subsidized low-income housing facilities for senior citizens was entitled to a charitable tax exemption.[25] The trial court had held that the federal rent subsidy revenue received by the corporation could be considered "a donation."[26] The supreme court disagreed. The court explained the importance of the donation factor to the rationale underlying exemptions:
[T]he requirement of donations is an important factor, because charitable donations reduce the cost of the service provided, either to the public generally as direct beneficiaries of the service or to taxpayers who would otherwise bear the burden.[27]
The Idaho court observed that federal subsidies do not satisfy the donations requirement because they do not reduce the cost of the services to taxpayers who would otherwise bear the burden of providing them. Instead, they are the cost to the taxpayers:
Housing Southwest argues that, because it provides housing to low-income senior citizens and disabled persons based on need it is meeting a need that might otherwise be met by government. This argument is circular in that the need Housing Southwest meets is in fact being met by government through tax-supported FHA subsidies.[28]
The court explained that if federal subsidies qualified as donations and thus qualified the corporation distributing the subsidies for tax exemption "the burden is merely shifted from one group of taxpayers to another, and government is not relieved from an obligation it would otherwise have."[29]
In my judgment TCC fails the gift to the public test. The services that it provides are *147 fully paid for. They are not gifts or contributions because TCC does not rely in any substantial way on donations of funds, property, or labor. Further, since TCC's services are funded by the government, the quid pro quo relationship that justifies charitable exemptions does not apply. If TCC's services were considered a gift, they would have to be considered a gift from the public because the public pays for them. Granting a tax exemption to TCC is not justified under the quid pro quo model because the government has already paid for the services TCC provides. As in the Housing Southwest case,[30] the main effect of an exemption will be to shift part of the burden of supporting TCC's programs from one group of taxpayers to anotherhere, primarily, from all those who pay taxes to the federal government to Fairbanks North Star Borough taxpayers.
In reaching these conclusions I do not suggest that the receipt of government funds means that a nonprofit service provider is necessarily ineligible for a charitable exemption. Nor do I believe that such an organization is disqualified from charitable status because it receives income from those to whom it provides services. What is required by the gift to the public test is that in a substantial way the services provided be based on private donations. Because this essential element of the concept of charity was not shown by TCC to be present, I would reverse the decision of the superior court.
NOTES
[1] 43 U.S.C. §§ 1601-1629 (1971).
[2] 26 U.S.C. § 501(c)(3) (2002) (exempting from federal income taxation "[c]orporations, and any community chest, fund, or foundation, organized and operated exclusively for ... charitable ... purposes").
[3] See Alaska Const. art. IX, § 4; AS 29.45.030(a)(3). See also Fairbanks North Star Borough Ordinance (FNSB) 3.08.020(F).
[4] On remand, the borough assessor made these findings, among others:

4. TCC does not generally receive donations or use volunteers. Generally, except for some minor local grant funding, all of TCC's revenues used to operate its programs come from federal and State of Alaska contracts and grants. TCC operates some programs under non-refundable compacting agreements with the federal government. TCC's other programs are funded through cost-reimbursable contracts with both the federal government and the state of Alaska. Indirect administrative and other costs not charged directly to a particular program are paid through an indirect cost allocation system at previously negotiated rates. If the negotiated rate results in either over-funding or under-funding of the indirect costs in one year, those costs are recovered or refunded to the grantor by adjusting the next year's indirect rate.
5. By the end of the 1998 fiscal year, TCC accumulated a total fund balance of over 27 million dollars. With the exception of its lease activities, TCC primarily accumulates this money by depositing the difference between what TCC receives from the government and its actual expenditures. This fund balance in leaner years covers funds that a program overspent or costs that the government disallows.
6. In addition to money received directly from governmental entities, TCC generates program income by billing third party insurance companies, including Medicaid and Medicare for services originally funded by the government. This program income generally may be spent by TCC only for that program and for that type of service. TCC uses this income to supplement its services largely in the health area. This income provides the largest source of what TCC calls "self-generated" money.
7. TCC also generates income by investing annually approximately 30 million dollars in federal program sums paid in advance. TCC is permitted by federal law to earn interest on federal money. In addition, TCC receives interest income by investing payroll, leave, and other accounts originally funded by program funds (federal or state dollars). All of this income is designated on TCC's financial statements as interest and investment income.
[5] Cf. Alaska R.App. P. 609; City of Nome v. Catholic Bishop of N. Alaska, 707 P.2d 870, 875 (Alaska 1985).
[6] CH Kelly Trust v. Municipality of Anchorage, Bd. of Equalization, 909 P.2d 1381, 1382 (Alaska 1996).
[7] Catholic Bishop, 707 P.2d at 876 (citing Earth Res. v. State, Dep't of Revenue, 665 P.2d 960, 965 (Alaska 1983)).
[8] Id.
[9] Ketchikan Gateway Borough v. Ketchikan Indian Corp., 75 P.3d 1042, 1045 (Alaska 2003) (quoting State, Dep't of Transp. & Pub. Facilities v. Sanders, 944 P.2d 453, 456 (Alaska 1997)).
[10] Sisters of Providence in Washington, Inc. v. Municipality of Anchorage, 672 P.2d 446, 447 (Alaska 1983).
[11] Catholic Bishop, 707 P.2d at 877.
[12] Id. at 879 (quoting Animal Rescue League v. Bourne's Assessors, 310 Mass. 330, 37 N.E.2d 1019, 1021 (1941)).
[13] City of Nome, 707 P.2d at 875.
[14] Balough v. Fairbanks N. Star Borough, 995 P.2d 245, 254 (Alaska 2000).
[15] (Emphasis added.) After 1923 Alaska municipalities could assess property taxes subject to this statutory exemption: "[A]ll property used exclusively for religious, educational, charitable purpose... shall be exempt from taxation." Ch. 97, § 12, SLA 1923. Identical language in the territory's codified statutes, § 16-1-35, Alaska Compiled Laws Annotated (ACLA) 1949, described Alaska's charitable-purposes exemption as it stood in 1956, when Alaska's constitutional delegates approved the language contained in article IX, section 4 of the Alaska Constitution. Among other changes they made to the language of the pre-statehood statutory exemption, the delegates added the "non-profit" qualification and the "as defined by law" clause. Alaska Const. art. IX, § 4.
[16] AS 29.45.030 provides in pertinent part:

(a) The following property is exempt from general taxation:
....
(3) property used exclusively for nonprofit religious, charitable, cemetery, hospital, or educational purposes.
(Emphasis added.)
[17] FNSB Ordinance 3.08.020(F) exempts property from taxation if it is "used exclusively for nonprofit religious, charitable, cemetery, hospital, or educational purposes."
[18] Greater Anchorage Area Borough v. Sisters of Charity of House of Providence, 553 P.2d 467, 469 (Alaska 1976); McKee v. Evans, 490 P.2d 1226, 1230 (Alaska 1971).
[19] In support of that proposition the superior court cited Sisters of Providence v. Municipality of Anchorage, 672 P.2d 446, 447 (Alaska 1983) (quoting McKee, 490 P.2d at 1230 n. 18).
[20] The borough's appellate briefs often refer to the exemption as one for "charitable use." We assume that the borough is using that phrase as shorthand for the charitable-purposes exemption, and is not attempting to recast the constitutional test, which requires that the property be exclusively used for "charitable purposes." For consistency, we will use the phrase "charitable purposes," per article IX, section 4 of the Alaska Constitution.
[21] Alaska Const. art. IX, § 4; AS 29.45.030(a)(3).
[22] McKee, 490 P.2d at 1231.
[23] See supra note 15.
[24] We interpret statutory language to avoid superfluity. Municipality of Anchorage v. Repasky, 34 P.3d 302, 312 n. 80 (Alaska 2001). This principle also applies to constitutional interpretation. Cf. Hootch v. Alaska State-Operated Sch. Sys., 536 P.2d 793, 801 (Alaska 1975) ("The general rule in constitutional construction is to give import to every word and make none nugatory.").
[25] Alaska Const. art. IX, § 4; AS 29.45.030(a)(3).
[26] AS 29.45.030(c) provides:

Property described in (a)(3) or (4) of this section from which income is derived is exempt only if that income is solely from use of the property by nonprofit religious, charitable, hospital, or educational groups. If used by nonprofit educational groups, the property is exempt only if used exclusively for classroom space.
[27] Greater Anchorage Area Borough v. Sisters of Charity of the House of Providence, 553 P.2d at 472.
[28] See supra note 2.
[29] Catholic Bishop, 707 P.2d at 889.
[30] Id. at 879; Evangelical Covenant Church v. City of Nome, 394 P.2d 882, 883 (Alaska 1964).
[31] Catholic Bishop, 707 P.2d at 881.
[32] Evangelical Covenant Church, 394 P.2d at 885.
[33] Greater Anchorage Area Borough v. Sisters of Charity, 553 P.2d at 472 (holding three floors rented to doctors in private practice of medicine not exempt, because floors' use by owner to support nonprofit hospital was not exclusive and floors' actual use was not charitable).
[34] 707 P.2d 870, 880 (Alaska 1985).
[35] 439 P.2d 441, 445 (Alaska 1968) (quoting Old Colony Trust Co. v. Welch, 25 F.Supp. 45, 48 (D.Mass.1938)).
[36] Catholic Bishop, 707 P.2d at 888 n. 37 (quoting Holbrook & O'Neill, California Property Tax Trends: 1850-1950, 24 S. CAL. L.REV. 252, 272 (1951)).
[37] King's Lake Camp, 439 P.2d at 445-46.
[38] Catholic Bishop, 707 P.2d at 891.
[39] Id. at 890-91.
[40] See id. at 888-89; King's Lake Camp, 439 P.2d at 444.
[41] King's Lake Camp, 439 P.2d at 444 (holding that charging user fees to defray operational expenses did not establish that there was "any real profit motive").
[42] Catholic Bishop, 707 P.2d at 889; see also King's Lake Camp, 439 P.2d at 444-45.
[43] King's Lake Camp, 439 P.2d at 444-45.
[44] Catholic Bishop, 707 P.2d at 892.
[45] Id. at 890-91.
[46] See id. at 881 (holding in part that Alaska Constitution and AS 29.53.020 require spatial apportionment between exempt and non-exempt purposes); Sisters of Charity, 553 P.2d at 472 (holding that nonprofit hospital that rented out part of its property for private office space did not exclusively use its property for hospital purposes); King's Lake Camp, 439 P.2d at 445 (holding that property used to operate recreational camp was used for charitable purpose and that charging nominal user fees did not divest property of tax exemption); Evangelical Covenant Church, 394 P.2d at 883 (holding that church radio station, which sold commercial radio time, did not qualify for religious purpose tax exemption because property was not used exclusively for religious purposesregardless of whether income derived from station-funded church activities).
[47] See, e.g., G.D.L. Plaza Corp. v. Council Rock Sch. Dist., 515 Pa. 54, 526 A.2d 1173, 1177-78 (1987) (holding that nonprofit housing corporation that received substantial federal government funding was not "maintained by public or private charity" as required by Pennsylvania statute and did not qualify for exemption); Parker v. St. Stephen's Urban Dev. Corp., 243 N.J.Super. 317, 579 A.2d 360, 364 (1990) (holding that nonprofit housing corporation that received all of its funding from government did not qualify as charity in tort action under Charitable Immunity Act).
[48] See, e.g., Hous. Southwest, Inc. v. Washington County, 128 Idaho 335, 913 P.2d 68, 72 (1996) (holding that nonprofit low income housing corporation that received federal subsidies did not qualify for exemption in part because it did not receive support from donations); Supervisor of Assessments of Baltimore City v. Har Sinai W. Corp., 95 Md.App. 631, 622 A.2d 786, 791-92 (1993) (holding that nonprofit housing corporation that received federal government subsidies but no donations did not qualify for exemption).
[49] See supra note 48.
[50] See, e.g., S. Jersey Family Med. Ctrs., Inc. v. City of Pleasantville, 351 N.J.Super. 262, 798 A.2d 120, 131 (2002) (upholding exemption for community health care facility that received majority of its federal funding for services rendered and not through grants); State Dep't of Assessments & Taxation v. N. Baltimore Ctr., 129 Md. App. 588, 743 A.2d 759, 772 (2000) (holding that facility used for providing indigent mental health services and that received most of its funding through government funds and minimal donations qualified for tax exemption).
[51] See, e.g., Yorgason v. County Bd. of Equalization of Salt Lake County, 714 P.2d 653, 660 (Utah 1986) (holding that whether low income housing was subsidized through government or private donor did not dictate different result as long as there is gap between what beneficiary pays and value of what beneficiary receives); Franciscan Tertiary Province of Missouri v. State Tax Comm'n, 566 S.W.2d 213, 226 (Mo.1978) (holding that purpose for which property is used is determinative, that factors such as donations are only relevant if they indicate institution's purpose, and that federal subsidies have same effect as charitable contributions from private sector).
[52] Alaska Const. art. IX, § 4.
[53] 25 U.S.C. § 450.
[54] See, e.g., Snyder Act of Nov. 2, 1921, 25 U.S.C. § 13.
[55] King's Lake Camp, 439 P.2d at 445 (quoting from Old Colony Trust Co. v. Welch, 25 F.Supp. 45, 48 (D.Mass.1938)).
[56] 25 U.S.C. § 450(a) ("the Federal government's historical and special legal relationship"); 25 U.S.C. § 450n ("Nothing in this subchapter shall be construed as ... (2) authorizing or requiring the termination of any existing trust responsibility of the United States with respect to the Indian people."); see also 25 U.S.C. § 451 (authorizing Secretary of Interior to "accept donations of funds and other property for the advancement of the Indian race" and to "use the donated property in accordance with the terms of the donation in furtherance of any program authorized by other provision of law for the benefit of Indians").
[57] 25 U.S.C. § 450(a)(1); 25 U.S.C. § 450a(a).
[58] Old Colony, 25 F.Supp. at 48.
[59] For a comprehensive list of states employing multi-factor tests for charitable exemptions, see North Baltimore Center, 743 A.2d at 768 n. 3.
[60] King's Lake Camp, 439 P.2d at 445 (quoting Old Colony, 25 F.Supp. at 48).
[61] 672 P.2d 446, 451 (Alaska 1983).
[62] King's Lake Camp, 439 P.2d at 446 (holding that recreational camp constituted use for charitable purpose).
[63] City of Nome v. Catholic Bishop of N. Alaska, 707 P.2d 870, 890 (Alaska 1985) (holding that radio station whose programming focused on Native issues benefited general public).
[64] 490 P.2d 1226 (Alaska 1971).
[65] Id. at 1230.
[66] Id. at 1231.
[67] See King's Lake Camp, 439 P.2d at 446 (emphasis added).
[68] Catholic Bishop, 707 P.2d at 891.
[69] See, e.g., King's Lake Camp, 439 P.2d at 443 (holding that camp that charged nominal user fees still qualified for exemption even though camp did not absorb cost of those who could not afford it, and instead passed this cost to the user groups).
[70] Id.
[71] Catholic Bishop, 707 P.2d at 889; see also King's Lake Camp, 439 P.2d at 444-45.
[72] TCC indicates that federal funds constitute approximately ninety percent of its funding. It argues that the rest of its expenses are covered by "self-generated" funds, including investment, interest, and rental income.
[73] See Sisters of Providence in Washington, Inc. v. Municipality of Anchorage, 672 P.2d 446, 451 (Alaska 1983).
[74] 490 P.2d 1226, 1229-30 (Alaska 1977).
[75] Former AS 29.10.336(a), recodified as AS 29.45.030(a).
[76] McKee, 490 P.2d at 1229-30.
[77] Id. at 1230.
[78] Irwin v. Wright, 258 U.S. 219, 228, 42 S.Ct. 293, 66 L.Ed. 573 (1922).

The rule established by the decisions of this court is that, by virtue of its sovereignty and the constitutional power of Congress to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States, no state can tax the property of the United States within its limits.
Id.
[79] The Alaska Constitution also addresses charitable exemptions. Alaska Const. art. IX, § 4. Federal law may also limit taxation of tribal property. See Ketchikan Gateway Borough v. Ketchikan Indian Corp., 75 P.3d 1042 (Alaska 2003), which concerned a federal preemption question not raised by the parties in the present case.
[80] City of Nome v. Catholic Bishop of N. Alaska, 707 P.2d 870, 889 (Alaska 1985); see also Matanuska-Susitna Borough v. King's Lake Camp, 439 P.2d 441, 444-45 (Alaska 1968).
[81] Catholic Bishop, 707 P.2d at 876.
[82] 312 Or. 82, 817 P.2d 1292, 1296 (1991).
[83] 394 P.2d 882 (Alaska 1964).
[84] Id. at 885.
[85] City of Nome v. Catholic Bishop of N. Alaska, 707 P.2d 870, 875 (Alaska 1985).
[86] Exceptions have been recognized to the exclusive-use requirement:

[W]e acknowledge two very narrow exceptions to the "exclusive use" rule. The first excepts de minimis uses. We foresee, as have other courts, that application of the "exclusive use" rule could be "so literal and narrow that it defeats the exemption's settled purpose.... Second, we acknowledge an exception under AS 29.53.020(a)(3) for property used for purposes directly incidental to and vitally necessary for the exempt use of other property.
Catholic Bishop, 707 P.2d at 879-80.
[87] The borough cites these cases as examples: Michigan United Conservation Clubs v. Lansing Township, 129 Mich.App. 1, 342 N.W.2d 290, 296 (1983); Minnesota State Bar Ass'n v. Commissioner of Taxation, 307 Minn. 389, 240 N.W.2d 321 (1976).
[88] TCC has raised no contention in this case that federal law preempts state law and consequently precludes taxation of any of the properties at issue here. Cf. Ketchikan Gateway Borough v. Ketchikan Indian Corp., 75 P.3d 1042 (Alaska 2003).
[89] AS 29.45.500(a) provides:

If a taxpayer pays taxes under protest, the taxpayer may bring suit in the superior court against the municipality for recovery of the taxes. If judgment for recovery is given against the municipality, or, if in the absence of suit, it becomes obvious to the governing body that judgment for recovery of the taxes would be obtained if legal proceedings were brought, the municipality shall refund the amount of the taxes to the taxpayer with interest at eight percent from the date of payment plus costs.
[90] Kenai Peninsula Borough v. Port Graham Corp., 871 P.2d 1135, 1140-41 (Alaska 1994) ("In light of today's decision, this award must be vacated and the court must make such further adjustments as will be necessary to reflect the fact that Port Graham is entitled to a refund of taxes only for 1988.").
[1] Ordinarily appeals from the placement of property on municipal assessment rolls are heard administratively by the municipal board of equalization. AS 29.45.190, .210. In the present case the parties agreed to bypass the board of equalization. Instead, formal hearings were held before the borough tax assessor, who entered written findings of fact and conclusions of law. TCC agreed that the assessor's findings of fact should be reviewed deferentially, just as those of a board of equalization would be. Unless otherwise indicated, the factual summary in this and the following paragraph are taken from findings of fact of the assessor.
[2] Article III(e), Articles of Incorporation.
[3] Greater Anchorage Area Borough v. Sisters of Charity of House of Providence, 553 P.2d 467, 469 (Alaska 1976).
[4] Ketchikan Gateway Borough v. Ketchikan Indian Corp., 75 P.3d 1042, 1045 (Alaska 2003). "All property is benefitted by the security and protection furnished by the State, and it is only just and equitable that expenses incurred in the operation and maintenance of government should be fairly apportioned upon the property of all." Id. (quoting Nome v. Catholic Bishop of Northern Alaska, 707 P.2d 870, 877 (Alaska 1985)).
[5] Our constitutional framers recognized that self-sustaining nonprofit groups would not necessarily come within the ambit of the word "charitable." In debating the need to include nonprofit cemeteries within the list of uses that are exempt from taxation, one delegate stated: "If you strike this [inclusion of cemeteries] I presume that you will make them subject to taxation, if and when the local government unit or the state ever imposed a tax, unless they were covered under the word `charitable,' and I'm pretty sure most of them are not charitable, they are just self-sustaining, nonprofit groups." Constitutional Minutes, page 2329, statement of V. Rivers. The amendment that sought to delete cemeteries was defeated. The main opponent of the amendment, Delegate McLaughlin, observed that nonprofit cemeteries, though not run "under religious or charitable auspices" nonetheless provide "a definite public service." Minutes 2329.
[6] Catholic Bishop, 707 P.2d at 890 (quoting Matanuska-Susitna Borough v. King's Lake Camp, 439 P.2d 441, 445 (Alaska 1968)).
[7] Id. at 891 (quoting King's Lake Camp, 439 P.2d at 446). We first approved of the dual definition of charitable status including the element of "a gift to a general public use" in the 1968 King's Lake Camp decision. Our only subsequent case that concerned properties claimed to be exempt under the term "charitable" as used in AS 29.45.030 was the 1985 Catholic Bishop decision. We found that the radio station and the youth hostel involved in that case satisfied the gift to the general public test. 707 P.2d at 890-91.
[8] 672 P.2d 446, 451 (Alaska 1983). This is the generally accepted rationale for granting charitable tax exemptions. Erika King, Tax Exemptions and the Establishment Clause, 49 SYRACUSE L.REV. 971, 981 (1999) ("The most common explanation for religious and charitable tax exemptions in the modern world is the `social benefit' theory, sometimes labeled the `public benefit theory' or the `quid pro quo theory.'").
[9] Legal commentators have referred to this as "the donative theory" of charitable tax exemption. See Mark A. Hall & John D. Columbo, The Charitable Status of Nonprofit Hospitals: Toward a Donative Theory of Tax Exemption, 66 WASH. L.REV. 307, 389-405 (1991). The authors of this article list numerous cases demonstrating that donations are essential to charitable status. Id. at 400-01, especially notes 331 & 332.
[10] In speaking of the "aid or encouragement" that exemptions supply for those who would act for the good of the community we have only referred to actors in the private sector as the targets of such incentives: "Exemptions are granted `as an aid or encouragement to individuals, corporations, or businesses, to do something supposedly for the good of the community at large....'" Catholic Bishop, 707 P.2d at 888 n. 37 (quoting Holbrook & O'Neill, California Property Tax Trends: 1850-1950, 24 S. CAL. L.REV. 252, 272 (1951)).
[11] 709 P.2d 265, 269 (Utah 1985).
[12] Id. at 272.
[13] Id. at 268.
[14] Id. at 274.
[15] Id.
[16] Id. at 278.
[17] 170 Conn. 556, 367 A.2d 1386 (1976).
[18] Id. at 1389.
[19] Id. at 1390.
[20] Id. at 1391.
[21] 243 N.J.Super. 317, 579 A.2d 360 (1990).
[22] Id. at 365.
[23] Id. (citation omitted).
[24] Id. at 366 (citation omitted).
[25] 128 Idaho 335, 913 P.2d 68 (1996).
[26] Id. at 70.
[27] Id. at 71-72.
[28] Id. at 72.
[29] Id. at 72-73. A number of other cases have taken similar positions declining to treat the administration of government funded programs as charitable. Clark v. Marian Park, Inc., 80 Ill. App.3d 1010, 36 Ill.Dec. 241, 400 N.E.2d 661 (1980) (rent payments and federal subsidies do not constitute public or private charity); Dow City Senior Citizens Housing, Inc. v. Board of Review of Crawford County, 230 N.W.2d 497 (Iowa 1975) (government has already assumed large share of burden through loan subsidies, exemption statute should not be applied to put additional burden on local property taxpayers); Supervisor of Assessments of Baltimore City v. Har Sinai West Corp., 95 Md.App. 631, 622 A.2d 786 (1993) (federal government subsidies are not considered donations); G.D.L. Plaza Corp. v. Council Rock Sch. Dist., 515 Pa. 54, 526 A.2d 1173 (1987) (organization was not charitable for purposes of exemption where all income came from federal government and rent paid by tenants); Yakima First Baptist Homes, Inc. v. Gray, 82 Wash.2d 295, 510 P.2d 243 (1973) (rent subsidies are not public donations). There is also contrary authority represented by the cases cited in footnotes 50 and 51 of the opinion of the court. But of the four jurisdictions represented there, only Utah is like Alaska in that it requires that charitable purposes include an element of a gift to the public, and the Utah court found that this element was present. Yorgason v. County Bd. of Equalization of Salt Lake County, 714 P.2d 653, 659 (Utah 1986) ("the Tower provides a gift to the community ... Episcopal Management Corporation has made and continues to make substantial contributions of both money ... and services...."). In any event, in light of the numerous authorities rejecting the view that government funding is equivalent to private charitable donations, our rule of narrow construction (as well as logic) counsels against adoption of this view.
[30] See supra at page 146.