*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Protective | ) | |
| Proceedings of Vernon H., | ) | Supreme Court No. S-14960 |
| | ) | |
| VERNON H. and JUDITH H., | ) | Superior Court No. 3AN-12-00209 PR |
| | ) | |
| Appellants, | ) | O P I N I O N |
| | ) | |
| v. | ) | No. 6945 – August 22, 2014 |
| | ) | |
| PETER H., | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Anne R. Helzer, Anchorage, for Appellant Vernon H., and Kenneth P. Jacobus, Kenneth P. Jacobus, P.C., Anchorage, for Appellant Judith H. Jonathon A. Katcher, Pope & Katcher, Anchorage, for Appellee Peter H.

Before: Fabe, Chief Justice, Winfree, Stowers, and Bolger, Justices. [Maassen, Justice, not participating.]

FABE, Chief Justice.

## I. INTRODUCTION

An elderly father was hospitalized for medical testing and treatment. The father had previously granted a durable power of attorney to his eldest adult daughter and

had been residing with his youngest adult daughter and her family. One of the father's adult sons initiated guardianship and conservatorship proceedings over the father. The son's petition alleged that the father was incapacitated and unable to manage his affairs or his property, citing the hospital's psychiatric evaluation and the son's own observations. The petition also alleged that the eldest and youngest daughters were not looking after the father's best interests and wishes. The son later terminated the protective proceedings following a neuropsychological evaluation by the father's expert that concluded that the father did not need a guardian.

The father and his eldest daughter filed motions for attorney's fees and costs incurred in defending against the son's petition. The superior court denied both motions, concluding that Alaska Civil Rule 82 was entirely displaced by AS 13.26.131(d) and that the son's actions did not meet the standard for fee shifting required by that statute: that the petitioner initiated a proceeding that was "malicious, frivolous, or without just cause." We agree with the superior court's analysis and affirm.

## II. FACTS AND PROCEEDINGS

### A. Vernon's Family And His Recent Medical Problems

Vernon H.[1] was born in 1928 and has 15 living adult children. Vernon granted a durable general power of attorney over "[a]ll . . . matters" to his eldest daughter, Judith, in 2002. Since 2002, Vernon has chosen to live with his youngest daughter, Jeannette, and her family. Vernon reaffirmed those decisions in December 2011.

Peter, one of Vernon's sons, grew increasingly worried about his father's decision-making during Vernon's battle with cancer in late 2011 and early 2012. In

---

[1] We use initials in lieu of the parties' last names to protect the family's privacy.

late 2011, Vernon exhibited confusion, and tests revealed elevated calcium levels; consequently, Vernon was hospitalized. He underwent diagnostic testing and some treatment for suspected cancer, and he was later discharged and referred for further outpatient oncology testing and treatment. During Vernon's first stay in the hospital, Peter allegedly observed that Vernon "was out of it," that he "could not remember what was going on from hour to hour," and that he mistakenly "complained his children were not coming to see him."

Vernon's condition appears to have fluctuated following his first discharge from the hospital in late 2011. On one hand, in a pair of emails from Peter to the other siblings, Peter stated: "Dad seems . . . more alert than I've seen him in weeks, maybe a month. . . . He spoke clearly, decisively and was able to comprehend everything being said."[2] On the other hand, Vernon's primary physician observed that Vernon "was not very alert or himself at all." Vernon's doctor also recalled that he told Judith that Vernon had to undergo several more tests, but Judith was reluctant to have any more tests performed, claiming that "her dad was a 'very spiritual person, and felt like his problem had actually gotten better or gone away.' " Peter alleges that he was present at a meeting with Vernon and Vernon's doctors during which a course of treatment was agreed to, but Vernon subsequently canceled the follow-up doctor's appointments because Vernon mistakenly believed "the doctors had given him a clean bill of health." The doctor recalled that Judith did not seek follow-up testing and treatment until the doctor informed Judith that Vernon "would likely DIE within a few days if she did not take him to the hospital ASAP."

---

[2] Peter also stated: "Dad remains very alert and aware of everything around him. He carried on conversations during the entire visit, he answered all of the Dr.'s questions, asked his own questions when he had any, and made the final decisions to move forward with the upcoming surgery and necessary treatments."

On December 19, 2011, Alaska's Adult Protective Services agency received a report alleging that Vernon was "mentally incapacitated," that Jeannette and Judith had "refused contact with family and have disregarded physician care and advice," and that there was "possible [f]inancial [e]xploitation." Judith recalls that around the same time, several siblings "paid an unannounced visit at [Vernon's] home" with Peter as "spokesperson," trying to "convince [Vernon] to move out of his home and into another residence." Vernon declined.

Vernon was readmitted to the hospital on January 20, 2012, with the medical record noting that he was "pleasantly confused." Vernon underwent chemotherapy treatment. At one point during this second hospitalization, Judith refused morphine for her father, and even physically pushed a nurse away when she was trying to administer it, before Vernon countermanded her order.[3] Judith also tried to exclude the other siblings from the hospital room until Vernon told her he didn't want a "standoff." Peter's affidavit states that Peter visited Vernon during this second hospitalization and observed that Vernon "was out of it" and "did not know why he was in the hospital" and "did not remember from one day to the next."

On January 26, 2012, Peter drafted an email to the other siblings summarizing his recent discussions with Vernon's doctors. In the email, Peter stated that Vernon said he " 'pretty much' understands what the doctor is explaining" and that "Judy will remain 'point person' for the family." Judith alleges that Peter was "playing both sides of the fence" and that three days earlier, Peter and many other siblings had "tried to force" Vernon to sign a new durable general power of attorney they had drafted.

---

[3]     The hospital appears to have filed a notice of harm with Adult Protective Services following this incident.

Peter also alleges that on January 26, Vernon asked him to confer with Vernon's attorney and help manage and distribute some financial assets.

On January 28, 2012, Vernon executed a will while still in the hospital. Peter's affidavit states that he was in the room and observed that Vernon "was sluggish," took "several minutes to write his name" and "more than a minute to initial each of the pages," had to be coached on how to spell his name, did not have his hearing aids in, and did not have reading glasses on for execution of two of the three copies of the will. The superior court later reviewed a video of the will execution and described Peter's "characterization of the events in the video as accurate." Peter requested a copy of the will,[4] and Vernon allegedly refused to provide it.[5]

In order to "assess [Vernon's] capacity to accept/refuse pain medication and other minor issues such as dietary care," the hospital had a nurse practitioner perform a psychiatric evaluation of Vernon on January 30, 2012.[6] The evaluation noted that Vernon was "notably confused and delirious prior to his last admission in December," that he had been "pleasantly confused" at the time of his readmission in January, and that "[h]is mental status has varied somewhat since admission, with some definite clearing . . . from [January] 25th through the 28th." The report stated that Judith claimed that Vernon "is more confused [today] than he usually is and that this is not his baseline mental

---

[4]    Peter stated in an affidavit that he asked for the will because he assumed that he "could use the will to fulfill [Vernon's] wishes for [Peter] to deal with the [financial assets]" that Vernon had allegedly asked him to manage a few days earlier.

[5]    A few days later, Peter's attorney demanded that Vernon's lawyer provide a copy of the will to Peter, stating the attorney's belief that Vernon "directed [Vernon's attorney] repeatedly to provide a copy of the document to Peter." Vernon's lawyer responded saying that Vernon clearly stated at the will execution that Peter was not to have a copy of the will.

[6]    The evaluation was co-signed by a doctor.

status." Judith explained that Vernon's cognitive abilities had "worsened significantly" since the day before.[7] The hospital's psychiatric evaluation recorded that on January 30, 2012, Vernon was "displaying a significantly fluctuating span of attention, an inability to encode or recall information, and general cognitive disorganization" and that "[h]is insight is poor" and "[h]is judgment is impaired."

The hospital's psychiatric evaluation concluded that Vernon's symptoms that day were "very consistent with delirium" and that "[a]t this time, the patient is not able to demonstrate that he can retain and weigh the risks and benefits of any information, and actually does not demonstrate capacity regarding the potential consequences of pain management on an acute basis." The report described this delirious condition as "acute" and subject to short-term fluctuation.[8] The evaluation's conclusions were borne out by observations of doctors and hospital staff over the next few days.[9]

---

[7] Vernon was allegedly given Benadryl one and a half days before the psychiatric evaluation, and Vernon's medical expert, Dr. Paul Craig, subsequently determined that Benadryl "can result in an acute confusional state" in an elderly patient that would be "consistent with Vernon's reported comportment following the dose of Benadryl in January [2012]."

[8] The same nurse practitioner stated in a follow-up note in the medical records that she was "certainly not encouraging seeking guardianship at this time, based on the description of his high functioning prior to delirium by Judy and his physicians."

[9] Medical progress notes from one of Vernon's doctors on January 30, 2012 state that Vernon had "a fluctuating mental status" and was "competent to make limited decisions about care of himself, such as pain[,] likes[, and] dislikes," but the doctor did "not feel that [Vernon] is competent to discuss complicated medical issues and evaluate[] risk-benefit." Similarly, on February 1, 2012, one of Vernon's doctors noted in a medical record that Vernon displayed "[s]table delirium and lethargy," while Vernon's dietician noted his "fluctuating mental status."

**B.** **Peter Petitions For Guardianship And Conservatorship But Later Withdraws The Petitions.**

Two days after the January 30, 2012 psychiatric evaluation, Peter[10] filed emergency and long-term petitions for guardianship over Vernon pursuant to AS 13.26.105[11] and for conservatorship over Vernon's property pursuant to AS 13.26.180.[12] Peter alleged that Vernon was incapacitated[13] and unable to manage his property.[14] Peter's petition characterized the hospital's "[n]europsych evaluation" of

---

[10] Peter and another sibling allege in affidavits that Peter had the support of all of the surviving adult siblings, save Judith and Jeannette. One of the siblings alleged in an affidavit that she and the other siblings supported Peter's guardianship petition because Vernon "appeared . . . to be mentally compromised" and because they were "very concerned that Judith has repeatedly demonstrated a profound inability to take care of Vernon's health care best interests."

[11] AS 13.26.105(a) provides that "[a]ny person may petition the court for a finding of incapacity and the appointment of a guardian . . . for another person," and AS 13.26.105(c) provides that "[t]he petition may also . . . include a request for temporary guardianship . . . if the petitioner believes there is an imminent danger that the physical health or safety of the respondent will be seriously impaired during the pendency of the guardianship proceeding."

[12] AS 13.26.180(a) provides that "any person who would be adversely affected by lack of effective management of the property and affairs of the person to be protected, may petition for the appointment of a conservator," and AS 13.26.180(c) provides that "[t]he petition may include a request for temporary conservatorship . . . if it appears that the respondent's property is likely to be wasted or dissipated during the pendency of the conservatorship proceeding."

[13] AS 13.26.005(5) defines an "incapacitated person" as " a person whose ability to receive and evaluate information or to communicate decisions is impaired . . . to the extent that the person lacks the ability to provide the essential requirements for the person's physical health or safety without court-ordered assistance."

[14] AS 13.26.165(2) provides that a conservator may be appointed "if the court
(continued...)

-7- 6945

January 30, 2012, as determining that Vernon "is not competent to make treatment or financial decisions," and he further alleged that Judith "is attempting to remove [Vernon] from [a healthcare facility] against [Vernon's] express wishes and against medical advice." Peter also alleged that Vernon owned a one-percent interest in a natural gas lease that was "currently in the process of distribution" and that Vernon "directed [Peter] to become the trustee" and "manage this investment."

Vernon, through his privately retained attorney, moved to dismiss the petition, stating that Vernon was lucid and competent, wished to retain Judith as his durable power of attorney, wished to continue living with Jeannette, and intended to argue that Peter brought the petition in bad faith to gain control of Vernon's assets to pay Peter's personal debts. Judith, through her separate lawyer, stated that Judith concurred in the motion to dismiss. Vernon supported the motion with an affidavit of his own, along with affidavits from 16 other people attesting to his capacity.

In a preliminary report from the court visitor dated February 7, 2012, the visitor noted that Peter filed the petition "out of concern for [Vernon's] medical well-being" and that Judith had been "controlling and difficult," had "refuse[d] pain medication for her father despite hospital standards of care," and had "reportedly pushed a nurse[']s hand away when attempting to administer morphine." The visitor observed that Vernon was "cognitively impaired (at varying degrees)" but that this impairment may have been temporary due to his hospitalization. The visitor recommended a continuance to give Vernon a chance to "regain his cognitive abilities after treatment." The visitor later conducted interviews to follow up on the two reports of harm filed with

---

[14](...continued)
determines that (A) the person is unable to manage the person's property and affairs effectively . . . ; and (B) the person has property that will be wasted or dissipated unless proper management is provided . . . ."

Adult Protective Services and concluded that "[t]he reports of harm were not substantiated and Adult Protective Services has not filed as a party to this matter though they are informed of these proceedings." In late March, the visitor notified counsel for Vernon, Judith, and Peter that a full neurological assessment by Vernon's expert was forthcoming and that in the meantime the court visitor's "current recommendation is that a guardian[] not be appointed."

On April 4, 2012, Judith's attorney submitted to the superior court and opposing counsel a report from Dr. Paul Craig, a board-certified clinical neuropsychologist. Vernon's attorney secured Dr. Craig as an expert, and after conducting two lengthy interviews and administering a battery of cognitive tests, Dr. Craig concluded that Vernon was "unequivocally competent" and met "all criteria for being his own guardian, making his own decisions, and making informed choices regarding his health care." Dr. Craig expressly concurred with the previous determination by one of Vernon's doctors expressed in a medical record dated February 21, 2012, that Vernon "is fully competent to carry out complex decision making. He is cognizant of the risk/benefits and has good insight into what is happening to him medically and psychologically." Dr. Craig noted that Vernon suffered from "emotional distress" stemming from Peter's petition that put "his ability to make his own decisions . . . in dispute." Finally, Dr. Craig specifically noted that Vernon was happy with the services Judith and Jeannette were giving him: Vernon "was very clear about his positive relationship with [Jeannette and her family] with whom he [was] residing" and "ha[d] no interest in relocating," and Vernon "expressed confidence about [Judith]."

On April 9, 2012, one day before trial was scheduled to begin, Peter notified the superior court that he wanted to withdraw his petitions and terminate the proceedings. The superior court signed the proposed order on April 11.

**C. The Superior Court Denies Vernon's And Judith's Motions For Attorney's Fees And Costs.**

Vernon moved for full attorney's fees and for costs related to Dr. Craig's expert report.[15] The motion alleged that Peter petitioned for guardianship and conservatorship knowing that Vernon was not incapacitated or incompetent and that Peter's true purpose was "to cause deliberate harm and emotional distress" to Vernon, Judith, and Jeannette "because [Vernon] would not allow [Peter] to view [Vernon's] will." The motion also alleged that Peter initiated the proceedings "for the malicious and selfish purpose of obtaining his father's assets in a thoughtless effort to preserve [Peter's] own rapidly declining financial situation." The motion stated that Vernon was entitled to attorney's fees and costs under both AS 13.26.131(d)[16] and Civil Rule 82.[17] Separately, Judith also moved for full attorney's fees, incorporating and reiterating the arguments made in Vernon's motion.[18]

Peter opposed the motions, denying Vernon's and Judith's allegations that he initiated the proceedings for an improper purpose. Peter argued that when he filed his petition on February 1, "he had a good faith, non-frivolous belief, based on substantial evidence, that Vernon was an incapacitated person in need of a guardian and a

---

[15] He sought $20,408.50 in attorney's fees and $5,657.50 for Dr. Craig's report.

[16] AS 13.26.131(d) provides: "The court may require the petitioner [in a protective proceeding] to pay all or some of the costs described in (a) and (b) of this section if the court finds that the petitioner initiated a proceeding under this chapter that was malicious, frivolous, or without just cause."

[17] Alaska R. Civ. P. 82(a) provides: "Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule."

[18] She sought $13,117.50.

conservator." Peter further argued that Civil Rule 82 was displaced by AS 13.26.131(d) and that no fees should be awarded under AS 13.26.131(d) because "[a]t the time he initiated his petition Peter had abundant evidence that Vernon was incompetent and that Judith was not taking good care of him" and because there was "no evidence" of an improper purpose. Peter pointed to his own affidavits about his contemporaneous observations of his father's condition, as well as the corroborating psychiatric evaluation performed by the hospital. He also argues that his subjective beliefs were objectively reasonable given the confirming notes of Vernon's confused mental state in Vernon's medical records prior to Peter's filing of the petition, as well as Vernon's general practitioner's description of events after Vernon's first hospitalization. He argues that because he didn't have access to all of Vernon's medical records until after he filed the petition, he had no reason to believe that "Vernon's delirium could be temporary."

The superior court denied Vernon's and Judith's motions for attorney's fees and costs. The superior court first ruled that Civil Rule 82 could not apply in this case because AS 13.26.131(d) "sets out 'a specific statutory scheme for awarding attorney's fees' . . . [and] therefore . . . displaces Civil Rule 82."[19] The superior court further ruled that attorney's fees of privately retained counsel may be recovered under AS 13.26.131(d).[20] The superior court then concluded that "there is insufficient evidence to support a finding that [Peter] instituted this proceeding 'maliciously, frivolously, or without just cause.' " On the contrary, the superior court stated that "[t]he detailed evidence presented by [Peter] makes out a *prima facie* case that this action was not initiated maliciously, frivolously or without just cause," noting that Peter had an

---

[19]     The superior court quoted *Enders v. Parker*, 66 P.3d 11, 14 (Alaska 2003).

[20]     The superior court cited *In re Guardianship of McGregory*, 193 P.3d 295, 298 (Alaska 2008).

objectively reasonable basis to support his subjective belief that Vernon was incapacitated and that Judith was not adequately protecting Vernon.[21]

Vernon and Judith appeal, filing their briefs jointly.

## III.   STANDARDS OF REVIEW

"Determinations of which legal authorities apply in a case and interpretations of what those legal authorities mean are questions of law subject to de novo review."[22]  "When construing the meaning of a statute under this standard, we look to the meaning of the language, the legislative history, and the purpose of the statute and adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[23]

Whether a litigant's conduct is malicious, frivolous, or without just cause within the meaning of AS 13.26.131(d) is a question of fact that we review for clear error.[24]  A superior court's factual finding "is clearly erroneous when a review of the entire record leaves us with the 'definite and firm conviction' that a mistake has been made."[25]

---

[21]   Vernon and Judith moved for reconsideration, but the motions were denied by operation of Alaska Civil Rule 77(k)(4) when the superior court did not grant the motions within 30 days.

[22]   *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 122 (Alaska 2014) (citations omitted).

[23]   *Enders*, 66 P.3d at 13-14 (internal quotation marks and citations omitted).

[24]   *In re McGregory*, 193 P.3d at 300.

[25]   *Williams v. Barbee*, 243 P.3d 995, 1000 (Alaska 2010) (quoting *Wee v. Eggener*, 225 P.3d 1120, 1124 (Alaska 2010)).

## IV.  DISCUSSION

### A.  The Superior Court Did Not Err By Denying Vernon's And Judith's Motions For Attorney's Fees And Costs Under AS 13.26.131(d).

Alaska Statutes 13.26.131(a) and (b) allocate certain categories of costs in guardianship proceedings to the state, respondent, and petitioner. Alaska Statute 13.26.131(d) enables the court to shift those costs to the petitioner: "The court may require the petitioner to pay all or some of the costs described in (a) and (b) of this section if the court finds that the petitioner initiated a proceeding under this chapter that was malicious, frivolous, or without just cause."

#### 1.  The fees of a respondent's privately retained attorneys and experts can qualify for fee shifting under AS 13.26.131(d) as "other court and guardianship costs" listed in AS 13.26.131(b).

The costs and fees identified in AS 13.26.131(a) and (b) — which are subject to shifting under AS 13.26.131(d) — include the costs of court visitors, experts, and attorneys "appointed" under various sections of the guardianship chapter of Title 13 of the Alaska Statutes. Nothing in AS 13.26.131 expressly discusses fees and costs of a respondent's *privately retained* counsel or experts. But subsection (b) includes a catch-all provision providing that normally "the respondent shall bear . . . other court and guardianship costs incurred under this chapter."

Previously, in *In re Guardianship of McGregory*, we declined to decide whether the costs of privately retained counsel or experts fell within one of the enumerated categories of costs in subsections (a) or (b) that could be shifted pursuant to AS 13.26.131(d).[26] Both parties in that appeal agreed that the costs of privately retained counsel or experts did not fall within AS 13.26.131(a) or (b) and were therefore not shiftable under AS 13.26.131(d), and "[f]or the purposes of this case we accept[ed] this

---

[26]     193 P.3d at 298 n.8.

position."[27] But we noted, without reaching the legal issue, "that it is possible that the fees of privately retained counsel are encompassed within the phrase 'other . . . guardianship costs' in subsection (b)."[28]

Today we decide what we hinted at in *McGregory*: The fees of privately retained counsel and experts qualify for fee shifting pursuant to AS 13.26.131(d) if the other requirements of that subsection are also satisfied. Those fees and costs constitute "other court and guardianship costs incurred under this chapter" within the meaning of AS 13.26.131(b). Our interpretation of AS 13.26.131(b) is consistent with our interpretation of other statutes allowing for the shifting of "costs."[29] As we have routinely held, "the term 'costs' is generally construed in Alaska to include attorney's fees."[30]

In this case, Vernon, the respondent, retained counsel and an expert. The fees and costs Vernon paid are "other court and guardianship costs" enumerated in

---

[27]     *Id.*

[28]     *Id.* (omission in original).

[29]     For example, AS 29.45.500(a) provides that a taxpayer who "pays taxes under protest," "bring[s] suit in the superior court . . . for recovery of the taxes," and prevails, is entitled to a refund, interest, and "costs." We have interpreted the allowance for "costs" to include attorney's fees. *See Kenai Peninsula Borough v. Port Graham Corp.*, 871 P.2d 1135, 1141 (Alaska 1994); *see also Fairbanks N. Star Borough v. Dena Nena Henash*, 88 P.3d 124, 142 (Alaska 2004); *Ketchikan Gateway Borough v. Ketchikan Indian Corp.*, 75 P.3d 1042, 1049 (Alaska 2003).

Similarly, AS 42.06.610 provides that " the commission may reallocate the cost of the proceeding [under the Pipeline Act] among the parties, including the commission, as is just under the circumstances." We have interpreted "costs" as used in AS 42.06.610 to include attorney's fees. *Amerada Hess Pipeline Corp. v. Alaska Pub. Utils. Comm'n*, 711 P.2d 1170, 1182 (Alaska 1986).

[30]     *Kenai Peninsula Borough*, 871 P.2d at 1141.

AS 13.26.131(b), normally borne by the respondent.  These fees and costs are eligible for shifting onto the petitioner, Peter, if the requirements of AS 13.26.131(d) are met.

> **2.      The superior court considered all three of the statutory factors required by AS 13.26.131(d):  whether the petitioner initiated a proceeding that was "malicious, frivolous, or without just cause."**

Vernon's first substantive argument for reversal is his allegation that the superior court's order denying his motion for fees and costs considered only whether the litigation initiated by Peter was "malicious" but failed to consider whether it was "frivolous, or without just cause."  Peter maintains that Vernon misunderstands the superior court's "repeated references to all three criteria."

We  reject Vernon's reading of the superior court's order. The superior court correctly stated all three prongs of the AS 13.26.131(d) standard:  "In guardianship proceedings, fees and costs may be awarded only if the Court finds that the petitioner initiated the proceeding maliciously, frivolously, or without just cause."  After reviewing the factual record, the superior court then found that "[t]he detailed evidence presented by Petitioner makes out a *prima facie* case that this action was not initiated maliciously, frivolously or without just cause."  Nothing in the superior court's order purports to restrict its analysis or findings to the maliciousness prong.

> **3.      The superior court did not impermissibly consider matters unknown to Peter at the time he initiated the guardianship petition in the course of deciding that Peter's petition was not initiated maliciously, frivolously, or without just cause.**

Vernon's second substantive argument for reversal is his allegation that the superior court — to support its conclusion that Peter's filing for guardianship was not malicious, frivolous, or without merit — impermissibly relied on evidence that was not known to Peter at the time of his filing of the petition for guardianship.  Vernon asserts that AS 13.26.131(d)'s adjectives — malicious, frivolous, or without just cause —

"appl[y] to the 'initiation' of the guardianship proceeding" and that therefore only those things known to Peter at the time of his filing of the guardianship petition can properly be considered to determine if that filing was malicious, frivolous, or without just cause. Vernon further argues that (with the exception of the psychiatric evaluation performed by the hospital) Peter never saw the medical records detailing doctors' observations of Vernon's mental health before Peter filed his petition; Vernon argues that the superior court therefore erred by considering those documents in the course of concluding that Peter did not initiate his petition maliciously, frivolously, or without just cause.

We conclude that the superior court did not improperly consider information that Peter did not yet know in concluding that Peter did not initiate the petition maliciously, frivolously, or without just cause. Instead, the superior court properly found that Peter had a good-faith basis for filing his petition based on Peter's own repeated personal observations and his access to the hospital's psychiatric evaluation. The superior court then concluded that this subjective concern for his father's mental condition was corroborated by objectively reasonable indicators such as the medical reports that were not available to Peter at the time he filed his petition. Vernon misreads the order, mistaking what is really support drawn from objective indicators reinforcing the reasonableness of Peter's subjective concerns and instead viewing it as improperly imputing knowledge to Peter that Peter could not possibly have known. But as the superior court clearly stated: "The medical records . . . strongly support [Peter's] contention that there was a legitimate concern over [Vernon's] mental clarity and capacity at the time this petition was filed" as well as concern that Judith "was not adequately protecting [Vernon]." Information developed through discovery can, as here, support a petitioner's good-faith and objectively reasonable belief about the necessity of a guardianship.

**4. Vernon has not satisfied his burden on appeal of showing that the superior court's factual finding — that Peter did not initiate his petition maliciously, frivolously, or without just cause — was clearly erroneous.**

The superior court determined that "[t]he detailed evidence presented by [Peter] makes out a *prima facie* case that this action was not initiated maliciously, frivolously or without just cause." The superior court noted that Peter "relied upon his own observations" of his father's declining cognitive condition while in the hospital; that Peter also relied on the observations "of qualified medical personnel" [that is, the hospital's psychiatric evaluation]; that the court had reviewed the video of the will execution and found Peter's "characterization of the events in the video [indicating Vernon's apparent cognitive impairment] as accurate"; and that Peter's own observations of Vernon's cognitive decline and Peter's reliance on third-party observations available to him at the time were supported by the additional third-party observations found in Vernon's medical records. The superior court also noted that Peter "has presented sufficient evidence to establish an objectively reasonable basis for his belief that Judith . . . was not adequately protecting [Vernon]." The superior court concluded that Vernon "has not presented sufficient evidence to the contrary" to persuade the superior court to find that Peter's petition was malicious, frivolous, or without just cause.

On appeal, Vernon must demonstrate that the superior court's factual finding — that Peter's guardianship proceeding was not initiated maliciously, frivolously, or without just cause — was clearly erroneous.[31] We conclude that he has not done this.

---

[31] *In re McGregory*, 193 P.3d at 300 ("How the State's conduct should be characterized was a question of fact for the superior court, and its finding that the petition was not malicious, frivolous, or without just cause is not clearly erroneous.").

Ample record evidence supports the superior court's findings, belying Vernon's assertion that Peter "simply [had] no evidence on February 1, 2012, to establish that Vernon . . . needed a guardian." First, evidence supports the superior court's finding that Peter had a good-faith concern about his father's mental capacity. Peter stated in an affidavit that he repeatedly observed his father in a state of apparent cognitive impairment during December 2011 and January 2012. His concerns about his father's mental condition were supported by the hospital's January 30, 2012 psychiatric evaluation,[32] which he cited in his February 1 petition. Second, evidence supports the superior court's finding that Peter's belief was objectively reasonable, such as the hospital's evaluation to which Peter had access as well as many contemporaneous observations of Vernon's declining cognitive condition. And the court visitor's

---

[32]     Vernon argues that the hospital's evaluation "did not even support incapacity, but does say that Vernon . . . is oriented, able to make his needs known, and that guardianship is not needed or recommended at this time." This characterization is misleading. The report never disavowed the need for guardianship; that was a subsequent note added to the medical records. And a fair reading of the evaluation itself shows grave concerns about Vernon's mental condition. Even if the report, standing on its own, was not sufficient to support an order imposing guardianship, it is certainly enough to generate a good-faith and objectively reasonable belief by Peter that there was a sufficient risk that Vernon needed a guardian to justify his initiation of guardianship proceedings.

Vernon also argues that Peter "falsely characterized that consultation as a 'neuropsychological evaluation' " in his petition. But the document itself is titled "Psychiatric Consultation," so Peter's characterization hardly seems out of line.

Finally, Vernon argues that Peter "secured" the hospital's evaluation in violation of federal law. But the report indicates the psychiatric evaluation was generated by referral from one of Vernon's physicians. Nothing in the record indicates that Peter played a role in "secur[ing]" the report. And even if he had initiated the hospital's evaluation, we do not understand how that could help demonstrate that Peter's reliance on the hospital's evaluation could not be reasonable as a basis for his good-faith belief that his father needed a guardian.

preliminary report even stated that Peter initiated the petition "out of concern for [Vernon's] medical well-being."

By contrast, Vernon identifies little, if any, evidence supporting his contention that the superior court clearly erred. Vernon claims on appeal that Peter's intent was to gain control of assets, citing Peter's petition. But Peter's petition merely alleged that Vernon wanted Peter to help Vernon distribute some of Vernon's assets. This view is bolstered by the court visitor's preliminary report, which discusses an interview with Vernon in which Vernon said, "Peter is helping with investments."

Vernon further argues that even if there is no evidence of an improper motive, there are two reasons to conclude that Peter could not have had a *proper* motive because he knew that Vernon had no need of protective proceedings.

First, he argues that Peter knew that Adult Protective Services had "closed its file on abuse claims against Vernon['s] . . . primary care givers in January 2012 for lack of substantiation of abuse." But nothing in the record indicates that Peter knew that the investigation had been closed. And nothing in the record indicates that the end of the investigation resulted from a conclusion that no guardian was needed. Further, the fact that claims of abuse are not substantiated in an initial investigation does not mean that a petitioner cannot have a good-faith and objectively reasonable concern about the need for a guardian.

Second, Vernon argues that Peter sent emails to the family in December and January indicating his contemporary knowledge that Vernon was not cognitively impaired and was content with Judith's and Jeannette's help. But the fact that Peter saw his father on some of his good days and reported as much to the family does not undermine Peter's observations of his father on his bad days. Vernon's doctors noted his "fluctuating mental status" several times during January. Peter's occasional observations of his father's cognitive ability do not undermine Peter's or others' contrary

observations at other times, and does nothing to undermine Peter's good-faith and reasonable concerns. They certainly do not compel us to conclude that the superior court clearly erred.

Finally, Vernon argues that the superior court "should have considered" other pieces of evidence that allegedly tend to show that Peter acted maliciously, frivolously, or without just cause, such as affidavits supporting Vernon's capacity filed with Vernon's motion to dismiss, or Dr. Craig's report. But those sources were available to Peter only after Peter initiated this action and thus are irrelevant to Vernon's claim that Peter initiated his action maliciously, frivolously, or without just cause. And even if Peter had been aware of the information in those affidavits and in Dr. Craig's report, the mere presence of countervailing evidence does not compel a conclusion that the superior court's finding of good faith was clearly erroneous.[33]

In sum, we conclude that Vernon has not met his burden of showing that the superior court clearly erred when it found that Peter did not initiate his petition for guardianship maliciously, frivolously, or without just cause and therefore could not receive attorney's fees and costs under AS 13.26.131(d).[34]

---

[33] Appellants' attorneys incorrectly characterize Dr. Craig's report when they state that Dr. Craig found that Vernon "had full capacity at all times before, during and following the initiation of the proceeding." Dr. Craig's report concluded only that Vernon had capacity at the time of Dr. Craig's evaluation.

[34] Peter also argues on appeal that Judith is ineligible to receive attorney's fees or other costs under AS 13.26.131(d) because Vernon, rather than Judith, was the "respondent" in the protective proceedings. We do not reach this issue because we conclude that the standard for fee shifting under AS 13.26.131(d) has not been met.

**B.**     **The Superior Court Did Not Err By Concluding That AS 13.26.131(d) Entirely Displaces Alaska Civil Rule 82 In Guardianship And Conservatorship Proceedings.**

Two fee-shifting provisions are potentially applicable in this case: Alaska Rule of Civil Procedure 82 and AS 13.26.131(d). As discussed above, AS 13.26.131(d) provides for fee and cost shifting only where the petitioner initiated a protective proceeding that was malicious, frivolous, or without just cause. Civil Rule 82(a), by contrast, states: "Except as otherwise provided by law . . . , the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule." Civil Rule 82 thus permits partial fee shifting as a matter of course.[35] It also gives the superior court discretion to impose enhanced (or diminished) fee awards based on several factors, including "the reasonableness of the claims and defenses pursued by each side," "vexatious or bad faith conduct," and "other equitable factors deemed relevant."[36]

In deciding the applicability of Civil Rule 82 in this case, we are guided by two statutory commands. First, we have stated as a general proposition that "[i]f a specific statutory scheme for attorney's fees exists, Civil Rule 82 does not apply" because fees would thus be "otherwise provided by law" within the meaning of Civil Rule 82(a).[37] Second, Alaska Rule of Probate Procedure 1(e) provides that "[w]here no specific procedure is prescribed by these [Probate] rules, the court may proceed in any lawful manner, including application of the Civil . . . Rules," but "[s]uch a procedure

---

[35]     For example, in a case involving no claim for money judgment that is resolved without trial (such as the instant case), the prevailing party shall receive "20 percent of its actual attorney's fees which were necessarily incurred." Alaska R. Civ. P. 82(b)(2).

[36]     *Id.* 82(b)(3)(F), (G), & (K).

[37]     *Enders v. Parker*, 66 P.3d 11, 17 (Alaska 2003).

may not be inconsistent with these rules and may not unduly delay or otherwise interfere with the unique character and purpose of probate proceedings."

We first addressed the relationship between Civil Rule 82, AS 13.26.131(d), and Probate Rule 1(e) in *In re Guardianship of McGregory*.[38] In that case, the state initiated a petition for guardianship but later did not oppose a motion to dismiss after a social worker determined that the respondent was not in need of a guardian.[39] Rather than move for attorney's fees under AS 13.26.131(d), the respondent moved for fees pursuant to Civil Rule 82.[40] We held that routine awards of partial Civil Rule 82 fees as a matter of course to the prevailing party were not available because such routine fee shifting would "interfere with the unique character and purpose of guardianship proceedings" in violation of Probate Rule 1(e).[41] We noted that AS 13.26.131 normally leaves enumerated costs with the state or respondent as outlined in the statute (unless shifted pursuant to AS 13.26.131(c) or (d)), making routine fee shifting to the prevailing party under Civil Rule 82 at odds with the more-specific statutory mandate of AS 13.26.131.[42] And we distinguished between typically self-interested civil proceedings and beneficent guardianship proceedings, which "are not entirely adverse" and in which "application of [Civil] Rule 82 . . . could . . . deter the state from engaging in needed protective litigation."[43]

---

[38]     193 P.3d 295 (Alaska 2008).

[39]     *Id.* at 297.

[40]     *Id.*

[41]     *Id.* at 300.

[42]     *Id.* at 299-300.

[43]     *Id.* at 299 (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 167 P.3d 701,
(continued...)

But *McGregory* did not close the door entirely on applying Civil Rule 82 in guardianship and conservatorship proceedings. We suggested that "to the extent that [Civil] Rule 82 permits an award of up to full reasonable attorney's fees for vexatious or bad faith conduct or for cases that are malicious, frivolous, or brought without just cause, utilization of the rule does not interfere with the unique character of guardianship proceedings and in such circumstances the enhanced fee shifting contemplated by [Civil] Rule 82 could be considered to be authorized under Probate Rule 1(e) if AS 13.26.131(d) is inapplicable."[44] But this suggested role for Civil Rule 82 to provide enhanced fees where AS 13.26.131(d) was "inapplicable" was predicated on the stipulation by the parties in that case that AS 13.26.131(d) did not apply to the fees of privately retained counsel and experts.[45] Addressing that legal issue on the merits for the first time, we hold that the fees and costs of privately retained counsel and experts may be shifted pursuant to AS 13.26.131(d).[46] Thus, AS 13.26.131(d) applies in this case, as it does in every guardianship or conservatorship case. Accordingly, *McGregory*'s allowance for Civil Rule 82 fee enhancements where AS 13.26.131(d) is "inapplicable" describes an empty set.

We hold that AS 13.26.131(d) forecloses any role for Civil Rule 82 in the guardianship and conservatorship context. Anything in *McGregory* that would leave a

---

**43**(...continued)
703-04 (Alaska 2007)). We expressly invoked analogous holdings about the inapplicability of routine Civil Rule 82 fee shifting in the child-in-need-of-aid and civil-commitment contexts. *Id.* at 298 (citing *Wetherhorn*, 167 P.3d at 703 (commitment); *Cooper v. State*, 638 P.2d 174, 178 (Alaska 1981) (child-in-need-of-aid)).

**44**      *Id.* at 300 (footnotes omitted).

**45**      *Id.* at 298 n.8.

**46**      *See supra* section IV.A.1, text accompanying notes 26-30.

role for Civil Rule 82, based on an incorrect stipulation of law by the parties in that case, is abrogated. We reaffirm *McGregory*'s core conclusion: application of Civil Rule 82 would "interfere with the unique character and purpose of guardianship proceedings" in violation of Probate Rule 1(e).[47] We expand this core holding to foreclose all applications of Civil Rule 82, including for enhanced attorney's fees. And we clarify that Civil Rule 82 is inapplicable in guardianship or conservatorship proceedings regardless of whether the state or a private party initiated the petition.[48]

In sum, AS 13.26.131(d) entirely displaces Civil Rule 82 in guardianship and conservatorship proceedings, for two reasons. First, AS 13.26.131(d) is a specific statutory scheme that triggers Civil Rule 82(a)'s provision that Civil Rule 82 shall not apply when fee shifting is "otherwise provided by law." Second, application of Civil Rule 82 would "interfere with the unique character and purpose" of guardianship and conservatorship proceedings and is thus impermissible under Probate Rule 1(e).

Here, the superior court determined that it could not apply Civil Rule 82 in these guardianship and conservatorship proceedings. We affirm.[49]

---

[47] *In re McGregory*, 193 P.3d at 300.

[48] We noted in *McGregory* that the proceedings in that case were "initiated by the State" and "express[ed] no view as to whether the holding of this opinion should be extended to guardianship proceedings initiated by *private* parties." *Id.* at 298 n.12 (emphasis added). But the logic of *McGregory* applies equally well in both cases. Guardianship proceedings initiated by a private party are similarly beneficent and "not entirely adverse," and "application of [Civil] Rule 82 . . . could . . . deter [private petitioners] from engaging in needed protective litigation" as much as it could deter beneficent state action. *Id.* at 299 (citation omitted).

[49] Because we conclude that Civil Rule 82 is inapplicable, we do not address Peter's argument that Judith is not a party and is thus ineligible for an award of attorney's fees under Civil Rule 82. Similarly, we do not address Vernon and Judith's

(continued...)

## V.   CONCLUSION

For these reasons, we AFFIRM the superior court's order denying Vernon's and Judith's motions for attorney's fees and other costs.

---

**[49]**(...continued)
arguments that they satisfied the requirements for routine or enhanced fees under Civil Rule 82.

Vernon and Judith also argue that the superior court erred by not considering the applicability of Civil Rule 82 for Peter's conduct *after* the initiation of the proceedings. They reason that AS 13.26.131(d) focuses narrowly on the initiation of a petition but "has no application regarding the conduct of the parties or on the proceeding as a whole. This is where [Civil] Rule 82 applies." Because they raised this argument for the first time in their reply brief, it is waived. *Oels v. Anchorage Police Dep't Emps. Ass'n*, 279 P.3d 589, 598-99 (Alaska 2012). But even if this argument were properly before us, it would be unavailing on the merits. *McGregory*'s core logic, and today's holding, forecloses the application of Civil Rule 82 in guardianship proceedings.